**Rebecca T. HALBROOK, Plaintiff,**

v.

**REICHHOLD CHEMICALS, INC., Defendant.**

**No. 89 Civ. 952 (KC).**

United States District Court, S.D. New York.

July 8, 1991.

---

Judith Vladeck, Vladeck, Waldman, Elias & Engelhand, New York City, for plaintiff.

Theodore Rogers, Sullivan & Cromwell, New York City, for defendant.

## OPINION AND ORDER

CONBOY, District Judge:

This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), to remedy alleged sex discrimination. Specifically, plaintiff Rebecca T. Halbrook ("Halbrook") contends that defendant Reichhold Chemicals, Inc. ("Reichhold") discriminatorily denied her a promotion to the position of General Counsel and thereby forced her to resign. Halbrook thus asserts claims for discriminatory failure to promote and for constructive discharge.

Reichhold denies plaintiff's claim of discrimination and asserts that the challenged decision was made for legitimate nondiscriminatory reasons. Reichhold further denies plaintiff's constructive discharge claim and asserts that plaintiff voluntarily resigned her position, despite encouragement by Reichhold management to remain with the company.

Plaintiff seeks wages and benefits lost as a result of defendant's alleged discrimination, including but not limited to salary, bonuses, stock options, insurance, and the value of the use of a company car; reinstatement with defendant in the position of general counsel; and attorneys' fees and costs. The defendant seeks dismissal of

the action with prejudice, costs, and reasonable attorneys' fees.

Trial of the case concluded on April 19, 1990. This opinion and order constitutes the Court's findings of fact and conclusions of law in the matter.

## I. *Background*

### A. Overview of Halbrook's Employment with Reichhold

In 1972, plaintiff Rebecca T. Halbrook graduated from Duke University School of Law, where she was an editor of the law review. She then clerked for a federal district judge in North Carolina, and thereafter became an associate in the Raleigh, North Carolina firm of Ragsdale & Liggett. From November 1973 to March 1977 she was associated with Willkie, Farr & Gallagher in New York City, working in the litigation and corporate departments. From 1977 to 1980 Halbrook worked as an attorney for Texaco, Inc., and from 1980 to 1982 she was Associate Counsel for GAF Corporation. In August 1982, Halbrook became Assistant General Counsel at Reichhold.

Halbrook thus arrived at Reichhold shortly after C. Robert Powell ("Powell") became Chief Executive Officer ("CEO") at Reichhold in April 1982. Under Powell, the company adopted a continuing three-year business plan, beginning in 1983. The "most critical part" of this plan was the acquisition and disposition of businesses. Tr. 1047. Before Reichhold hired Halbrook, Powell appointed Paul E. Dixon ("Dixon"), then the company's only attorney, to be Vice President, General Counsel, and Secretary. He also interviewed Halbrook that year and advised Dixon that he "felt she was very capable and it looked like a good choice." Tr. 1048–49.

During the course of her employment with Reichhold, Halbrook reported to Dixon. He in turn reported to Powell, who served as CEO of Reichhold from 1982 until March 31, 1988. In December 1982 Halbrook received a written performance evaluation with a rating of "commend-

able", a rating second only to "distinguished". The evaluation was prepared by Dixon and approved by Powell.

During August 1983, Halbrook interviewed a large number of applicants and recommended hiring Charles Lorelli ("Lorelli"). He graduated from the University of Pennsylvania Law School in 1978 and then spent five years working for Allied Corporation as an in-house counsel. Lorelli was hired, given the title Associate Counsel, and placed under Halbrook's supervision. The legal department also hired Rosalie Lawlor in 1983 as Assistant Counsel. Powell had no role in hiring either, Tr. 1049, and, as already observed, Halbrook interviewed Lorelli and recommended to Dixon that Lorelli be hired.

In 1984, Dixon recommended that Halbrook be promoted to serve as Assistant Secretary of the Corporation. This was approved by the Operating Committee and ultimately by Powell in April of that year, and Halbrook was promoted in May 1984. She remained Assistant General Counsel.

In her October 25, 1984 appraisal of Lorelli, Halbrook rated his legal advice and service as "distinguished". She further commented that his knowledge of the subject matter involved in the job was superb, that his productivity was excellent, and that his "work standards were consistently beyond reproach". The only reason she did not give him an overall rating of "distinguished" (she rated Lorelli "commendable") is because she thought (mistakenly) that they were unavailable. Tr. 658–59. Halbrook's own overall evaluation by Dixon at this time was "commendable".

Also during the month of October 1984, Dixon and Powell approved a "Career Development" form for Halbrook. Therein, she was assessed as "[r]eady in 1–2 years for increased responsibilities," with Vice President, General Counsel among the "most likely position[s] for promotion." PX 8;[1] Tr. 1113–14. In approving this form, Powell indicated a willingness to consider Halbrook for future promotions, including promotion to general counsel.

---

1. "PX" references plaintiff's trial exhibits.

In late 1984 Halbrook asked D. Eric Pogue ("Pogue"), Reichhold's Vice President for Human Resources, to appoint her to one of the company's administrative committees. She was subsequently appointed, with Pogue's approval, to the Human Resources Advisory Committee. Lorelli became a member of Reichhold's Retirement Committee.

In 1985, a bad year for Reichhold economically, neither Halbrook nor Lorelli received formal performance assessments, and neither Halbrook nor Dixon received a bonus for their 1985 performances. Because "Lorelli had had an outstanding year and deserved a bonus," Tr. 1053, however, Dixon proposed a "special bonus" for him and the Operating Committee approved it. Tr. 893, 1139.

In May 1986, Lorelli was promoted to the positions of Assistant Secretary and Assistant General Counsel, and was therefore holding the same titles as Halbrook, although she had supervised him for three years. In recommending Lorelli's promotion, Dixon told Powell that Lorelli was a "star performer" who had "fully earned the promotion." Tr. 1055.

In September 1986 Dixon filled out a "promotability forecast" in connection with the company's "succession planning" process. This procedure was designed to identify the person or persons within a department best able to take over during the next twelve months if the head of department position became open. In this document, DX U,[2] Dixon rated Lorelli his "# 1 Backup" and Halbrook as his "# 2 Backup". In an attached evaluation of Halbrook, Dixon wrote of her: "(a) sometimes perceived pure legalist as too slow (i.e. National Wax deal)". DX V; Tr. 1063–64.

In December 1986, Lorelli received the rare rating of "distinguished" from Dixon, and Powell agreed that in 1986 Lorelli "did service beyond the call of duty. Everything that he had done that year was exemplary." Tr. 1061–62. At the same time, Dixon rated Halbrook "commendable".

During this period, negotiations were proceeding that led to the October 1, 1987 acquisition of Reichhold by Dainippon Ink and Chemical Co. ("Dainippon"). In the months preceding the acquisition, Powell concluded that, since Reichhold would become a private company, a down-sizing of the legal department was required. The general counsel's position was also to be down-graded. The General Counsel would report to Pogue, to be up-graded to Senior Vice President, and not to the Chairman. Additionally, the General Counsel would no longer be a member of the company's Operating Committee. DX H. At about this time, Powell decided that Dixon's employment was to be terminated because he had been "quite vocal against the merger before it happened." Tr. 1066–67.

Powell decided, with the concurrence of Pogue, that Lorelli would be appointed General Counsel, succeeding Dixon. Tr. 1075–76. According to Powell, he based this decision upon his personal observations of Lorelli, the opinions of Reichhold business persons, Lorelli's overall performance appraisals, and the succession planning for Reichhold's legal department, wherein Lorelli had been rated "# 1 backup" to Dixon. Tr. 1076; 1063–64; 1079; DX U. In his testimony, Powell emphasized personal interaction with and knowledge of Lorelli's acquisitions and dispositions work in two transactions, the Rogue Valley sale, Tr. 1076–77, and the Plasmine Corporation acquisition, Tr. 1077. He was greatly impressed by Lorelli's work in these projects. *Id.* Powell also heard broad approval of Lorelli's legal skill from officials within Reichhold, specifically Division Presidents Andrew Katai and Larry Finnegan, and Executive Vice President Tom Mitchell, and, most importantly, from Dixon.

On September 28 or 29, 1987, Lorelli advised Halbrook that he had been chosen to succeed Dixon. Halbrook expressed to Pogue her disappointment and disagreement with the decision. Pogue urged her to stay, and she said she would, observing that she felt needed and appreciated by the company. A little more than one week

---

**2.** "DX" references defendant's trial exhibits.

later, Halbrook told Pogue that she intended to sue the company, but that she intended to continue to work at the company while the suit was pending.

Halbrook resigned, effective November 13, 1987, after she had secured a position with Sann & Howe, a New York law firm.

## B. Golf and "Women's Issues"

Powell determined that communication among mid- and senior-management at Reichhold was insufficiently direct and candid, and initiated a series of seminars to address this problem. Tr. 87, 1051. Employees were encouraged to be entirely forthcoming, and to identify obstacles in their personal inter-relationships with superiors and peers that were thought to impede efficiency and cloud communication. Tr. 292–93, 295–96, 462. Halbrook testified that at one such seminar in June 1984 she had a discussion with Dixon, Jim Gentel (the head of the purchasing department) and Tom Madden (the head of the environmental department) in which Gentel stated that the issues raised by Halbrook led him to believe that she "wanted to succeed as a woman and not as a business person." Tr. 473. Gentel also told her that she could succeed at Reichhold without having to learn golf, a pursuit apparently favored by senior management. Tr. 463, 465. Dixon encouraged her not to "let women's issues get in [the] way", PX 38, and not to "verbalize/insinuate that the women's issue has impact on her advancement." PX 54. Halbrook testified that Dixon told her it was not in her interest to raise these issues at Reichhold. Tr. 467. At the time of the 1984 seminar, Halbrook was pregnant and was to go on maternity leave shortly. In the course of seminar discussions, Halbrook asked Dixon to stop mentioning his concern that Halbrook might not return from leave and to state to those who asked that Halbrook would return. PX 54.

A few weeks prior to the seminar, when Halbrook was pregnant, Dixon, Pogue and Powell all approved Halbrook's promotion to Assistant Secretary, PX 13, a promotion Halbrook considered to be "a huge move. They were making me an officer. They sent me letters congratulating me and I considered it a big step." Tr. 432. Halbrook acknowledged that Dixon had been concerned about the return of an Associate General Counsel already out on maternity leave, and Halbrook testified that she saw nothing inappropriate about his concern, Tr. 594–95, or about a firm pursuing such information in connection with personnel policy. Tr. 591.

## C. Women's Fear of Success

Halbrook testified that, in the spring of 1984, when she went to Pogue to discuss her interest in obtaining a position on one of the company's administrative committees, the ensuing conversation led to a suggestion by Pogue that she read a book "about women fearing success, failure based on fear of success." Tr. 454. Pogue denied that he ever said such a thing to Halbrook. Tr. 887–88.

## D. Dixon's Delicatessen Statement

Halbrook testified that on September 29, 1987, after Dixon had been advised that he was being fired, she and Dixon met in a local delicatessen. According to Halbrook, Dixon told her, in connection with the Lorelli selection, that "the top management of the company was evil.... [I]t is intentional that there are no women in top management at Reichhold.... I've been part of the operating committee and I know things that you don't know.... [Y]ou should know that Pogue said that women are hard to manage." Tr. 515.

On cross-examination by Reichhold at trial, Dixon stated that in his long experience with Powell and Pogue, he "never heard" either suggest that a male would be a more appropriate choice for general counsel or for any other senior job, or that women managers were less appropriate within the structure of the company. Tr. 327–28. He also denied that either official had ever said that there were problems with managing women. Tr. 328. Dixon did assert that Pogue had once observed that "managing men and women was different at different times and for different reasons." Tr. 314.

### E. Statistical Evidence

Reichhold submitted at trial its 1986 Affirmative Action Plan, PX 42, which showed that for the Inorganic Chemical Industry, of which Reichhold was a member, there was a 7% presence for women in the category "officials and managers," i.e., 2,811 out of a total of 40,027. The presence for women in this category at Reichhold was, according to the report, 15%. *Id.* Halbrook attacked these numbers, asserting that by the end of 1987 the number of women in the "officials and managers" category at Reichhold had declined from seven to four, corresponding to a reduction in the percentage of women in the category from 15% to 7%. DX WW.

## II. *Discussion*

### A. Legal Principles

■ The legal framework for resolving sex discrimination claims under Title-VII is well established, and principally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff has the initial burden of demonstrating, by a preponderance of the evidence, a prima facie case. This Halbrook has done. She has shown that she belongs to the protected group; that she applied and was qualified for the promotion to General Counsel; that she was not promoted; and that the position was given to someone not in the protected group.

■ The defendant then is required to articulate some legitimate, nondiscriminatory reason for the employment action that it took. The defendant need "only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1152. It is proper for an employer to rely upon a supervisor's evaluations in assessing the employee's performance in connection with an employment decision. *Meiri v. Dacon*, 759 F.2d 989 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985);

*Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980). Indeed, past performance is the best qualification for promotion. *Grant v. Morgan Guaranty Trust Co. of New York*, 638 F.Supp. 1528, 1537 (S.D.N.Y.1986).

■ Thereafter, the plaintiff must prove by a preponderance of the evidence that the employer's profferred non-discriminatory reasons were a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1150–51. To establish pretext, plaintiff may demonstrate that, despite the reasons articulated by the defendant, a discriminatory motive led to the challenged decision, or that the explanation offered by the employer is not worthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1152. Pretext can also be shown by demonstrating that what defendant offers as the reason, while partially true, was not the determining factor in the promotion decision. *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983). In other words, "[p]laintiff is not required to show that [sex] was the sole factor in the employer's decision". *Geller v. Markham*, 635 F.2d 1027, 1035 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).

Accordingly, Halbrook, in order to establish pretext, is not required to show that the reasons offered were false, but only that they were not Reichhold's only reasons, and that the plaintiff's gender made a difference. *Parcinski v. Outlet Co.*, 673 F.2d 34, 36 (2d Cir.1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 950 (1983). However, "to the extent that the employer ... goes beyond merely articulating a neutral reason ... to substantiating that reason by proving that it has a sound and factually supported basis, the employee's task of showing that this reason was a pretext will be more difficult." *Wade v. New York Telephone*, 500 F.Supp. 1170, 1178 (S.D.N.Y.1980) (citing *Lieberman v. Gant*, 630 F.2d at 66).

■ On the other hand, as our colleague Judge Conner has observed, it is clear that the plaintiff seeking to prove a claim of sex

discrimination "need not demonstrate that her employer bears a conscious animus or malice toward women. Indeed, illegal discrimination often arises out of very subtle stereotyping that may reflect a benign or protectionist view of women and their place in society." *Lenihan v. City of New York,* 636 F.Supp. 998, 1009 (S.D.N.Y.1985). The Courts, in order to give life to the nation's civil rights laws, must be willing to read between the lines, and to recognize that circumstantial evidence may be the only evidence available to a title VII plaintiff. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

■ In those cases where there is direct evidence that a discriminatory motive played a part in the employment decision, the burden of proof, and not merely the burden of production, passes to the defendant, which then can avoid liability only by proving by a preponderance of the evidence that the same decision would have been reached absent the presence of that factor. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 243–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989).

■ Discriminatory motive and pretext may also be established by statistical evidence indicating gross disparities in defendant's treatment of employees within and without the protected classification. *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825–26. However, statistical analyses based solely upon the employer's own work force are not favored, and indeed, have been declared by the Supreme Court to be invitations to the adoption of racial quotas, "a result that Congress expressly rejected in drafting Title VII." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 652, 109 S.Ct. 2115, 2122, 104 L.Ed.2d 733 (1989). *See also Sweeney v. Research Foundation of State University of New York,* 711 F.2d 1179 (2d Cir.1983).

On the question of sufficiency of evidence to establish pretext, it is necessary to bear in mind that stray or off-hand remarks in the work place by non-decision makers will not suffice. *Martin v. Citi-*

*bank, N.A.,* 762 F.2d 212 (2d Cir.1985); *Haskell v. Kaman Corp.,* 743 F.2d 113 (2d Cir.1984).

### B. Analysis

Keeping these principles in mind, we now examine plaintiff's claim that Lorelli was appointed General Counsel because of Reichhold's gender bias against her. As we have indicated, Halbrook has established a prima facie case of employment discrimination. Thus, we turn first to Reichhold's proffered reason for promoting Lorelli instead of Halbrook, and then to Halbrook's attack on that reason as being a pretext for discrimination against her.

#### 1. *Reichhold's reason for promoting Lorelli*

■ At trial, Reichhold argued that it decided to promote Lorelli instead of Halbrook not because Halbrook is a woman, but because it legitimately believed that Lorelli was better qualified for the position of General Counsel. According to Reichhold, Powell and Pogue based their decision on their own opinions, based on experiences with both candidates, that Lorelli would make the better general counsel; comments of Reichhold's business personnel to the same effect; and Dixon's evaluations of Lorelli and Halbrook. The threshold question to be resolved is whether Reichhold has established that the selection of Lorelli over Halbrook was based upon Lorelli's superior performance and merit, not gender discrimination.

The four principal witnesses in the case, Powell, Pogue, Dixon, and Halbrook, all confirmed that Lorelli was a talented and valued attorney at Reichhold. Lorelli was hired in 1983 largely based upon the recommendation of Halbrook. Tr. 1048. In spite of business reverses in 1985, and notwithstanding the decision of the company to withhold bonuses from both senior officers and rank and file employees, Lorelli was awarded a special bonus by vote of the operating committee of Reichhold. Tr. 893, 1053, 1139. In May 1986, Lorelli was promoted to the positions of Assistant General Counsel and Assistant Secretary of the Corporation. Tr. 1054. This promotion

was recommended by Dixon, who told Powell that Lorelli was a "star performer" and "fully earned the promotion," Tr. 1055, and was approved by the Operating Committee, Tr. 1054.

Dixon consistently gave Lorelli higher performance ratings than Halbrook. In December 1986 Dixon gave Lorelli an overall rating of "distinguished", very few of which were given in any one year. Tr. 1061–62; DX G. Powell reviewed the performance evaluation and discussed the "distinguished" rating with Dixon, agreeing that in 1986 Lorelli "did service beyond the call of duty. Everything he had done that year was exemplary." Tr. 1061–62. Powell signed his approval of the distinguished rating. DX G. Also in 1986, pursuant to the succession planning assessment introduced at Reichhold by Powell, Lorelli was rated by Dixon, the general counsel, as his "No. 1 Backup". Tr. 1062. This promotability forecast in the legal department was presented by Dixon to the Operating Committee in September 1986, and there was no disagreement with Lorelli's ranking. Tr. 1063–64; DX U.

Thus, in 1987, after Reichhold had been acquired by Dainippon and Dixon's employment had been terminated, Powell decided that Lorelli should be promoted to General Counsel, a decision in which Pogue concurred. Tr. 1075–76. At the trial, Powell asserted that in making this decision, he had relied upon his personal observations of Lorelli, the opinions of Reichhold officials, Lorelli's overall performance appraisals, and the succession planning for Reichhold's legal department. Tr. 1076. We find this testimony completely convincing, and give it full credit. Powell at one point concluded: "Lorelli is basically a doer. He gets things done." Tr. 1078. He testified that when he made the decision to promote Lorelli:

I thought [he] was one of the very few corporate people that could be listed as a true achiever, there are not many people in corporations that you can say that about, and felt that he fully deserved the job.

Tr. 1079–80.

Powell's assessment of Lorelli's abilities, and his asserted reasons for selecting Lo-

relli, were confirmed and corroborated not only by the unchallenged personnel records of Reichhold, but also the testimony of three of Lorelli's corporate colleagues. Dr. Andrew Katai, president of Reichhold's Swift Adhesives Division, found "most remarkable" Lorelli's ability to "cut through some of the minutiae" so as to concentrate on the "critical issues", and called his work "first class" in a letter copied to Lorelli's superior. Tr. 174, 181–82, DX 00. Paul Dixon, though called to testify by Halbrook, confirmed that as Lorelli's immediate superior he heard many compliments about Lorelli's work. Tr. 333. He also confirmed that in 1986, in rating Lorelli as "distinguished" in four of the five sections in the productivity category of the evaluation, he had reported that "in the face of a heavy merger and acquisition program, he has continuously performed far above expectations." Tr. 341; DX G. Interestingly, although he was Halbrook's witness and asserted that both Halbrook and Lorelli were qualified to succeed him, he refused to say that Halbrook was superior to Lorelli. Tr. 312–13. Jay Olsen, another Halbrook witness, who was Reichhold's Chief Financial Officer from 1983 until September 1987, when he was discharged by Powell, refused to criticize Lorelli's performance in the sale of one the company's divisions, Tr. 384–89, and instead asserted that Lorelli had performed "excellently" in the transaction. Tr. 396. Though pressed by Halbrook's counsel, he also refused to say that he would have recommended Halbrook as a superior choice for general counsel had Powell solicited his opinion. Tr. 412–13.

The plaintiff herself recognized the very qualities in Lorelli that Powell said he relied upon in making his choice. In her 1984 appraisal of Lorelli, Halbrook gave him what she admitted was an "excellent" review. Tr. 652; DX F. She focused on the same strengths that Powell observed in Lorelli in 1987 (Lorelli "gets things done", Tr. 1078). Thus, she commended Lorelli in 1984 because his "productivity was excellent". DX F. She also noted that his "work standards are consistently beyond

reproach". *Id.* She observed that his "knowledge of the subject matter involved in the job is superb," emphasizing his "grasp of legal subject matter in the area of contract law and various legal aspects involved in acquisitions/dispositions". *Id.* Her 1984 rating of Lorelli noted that he should expand his knowledge of other areas of the law and, as Halbrook admitted, in the ensuing years he did. Tr. 662–64; *see also* Tr. 289–90. Halbrook admitted that she was so impressed with Lorelli's performance that she would have given him an overall "distinguished" rating, as Dixon later did, but thought (mistakenly) that they were not available. Tr. 658–59. She also testified that she knew of Dixon's concern in 1985 that Lorelli be paid more so that he would not be "lured away by some of these headhunters who were calling." Tr. 688.

We conclude that Reichhold had a legitimate business reason for promoting Lorelli. His appointment to the position of General Counsel was based upon considerations of performance and merit. Having examined in detail the comprehensive career record of both Halbrook and Lorelli, we specifically conclude, and find as a fact that Halbrook's qualifications were not superior to Lorelli's at the time that Powell made the decision to promote Lorelli; to the contrary, we find that Lorelli was better qualified than Halbrook.

### 2. *Halbrook's evidence of discriminatory motive*

Despite the above-enumerated evidence of Lorelli's extensive qualifications for the position of General Counsel, Halbrook argued at trial that Reichhold's decision to promote Lorelli was motivated by Halbrook's gender. To support this charge of discriminatory motive on the part of Reichhold, Halbrook relies on remarks purportedly uttered by Dixon and Pogue. These remarks are those assertedly (a) expressed principally by Dixon at the employee interrelationship seminars in 1984, (b) expressed by Pogue in his office in 1984, and (c) expressed by Dixon in the delicatessen in 1987.

#### a. the delicatessen statement

Because of the content of the asserted delicatessen remark, and its close proximity in time to Powell's promotion decision, we will assess this evidence first. The source of the Dixon delicatessen statement, set forth in the trial record at 514–516, is solely Halbrook. As we have indicated, *see supra* at 1294, Halbrook testified that, on September 29, 1987, after Dixon had been advised that he was being fired, she and Dixon met in a local delicatessen. Halbrook further testified that Dixon told her that "the top management of the company was evil. . . . [I]t is intentional that there are no women in top management at Reichhold. . . . I've been part of the operating committee and I know things that you don't know. . . . [Y]ou should know that Pogue said that women are hard to manage." Tr. 515. Though Dixon was a witness called by Halbrook, and was in some respects the central witness in the trial, Halbrook chose not to elicit testimony from him on the matter.

To understand the Court's ultimate assessment and disposition of this evidence, it is necessary to detail the circumstances and theories of the parties that led to the admission of this delicatessen statement in the first place. The plaintiff asserted that even though Dixon had been fired by Powell prior to Dixon's delicatessen utterance, he nonetheless remained in office by formal directive of the company until after the utterance was made; that the statement related to the scope of his duties as General Counsel, member of the operating committee, immediate superior of both Halbrook and Lorelli, preparer of evaluations of both that played a large role in the promotion decision, and counselor of Halbrook on her career path at Reichhold; and that the statement "it is intentional that there are no women in top management at Reichhold . . . ," was, in substance, a declaration, based upon Dixon's own knowledge and experience, implicating the corporate "state of mind" as revealed to Dixon in the policy formulations of the company's Operating Committee, specifically Pogue. As such, plaintiff argued, it did not contain double hearsay of an undisclosed declarant.

With respect to the asserted second part of Dixon's statement "that Pogue said that women are hard to manage", plaintiff and defendant both agreed that no double hearsay objection applied, since Pogue was indisputably an agent of an adverse party when his asserted statement was made.

The defendant argued, unconvincingly, that no agency or employment relationship existed between Dixon and Reichhold at the time of the delicatessen statement, and that, even if it did, the statement was unrelated to the scope of Dixon's duties at Reichhold. More troublesome was Reichhold's objection to the "it is intentional" remark on the ground that it is an unattributed statement of an undisclosed source whose vantage point, credibility and biases cannot be attacked. Although we acknowledged that the admissibility of the statement in the face of this objection was a close question, especially in light of the fact that the remark by its explicit terms does not purport to quote anyone but rather reports the subjective intent of the corporation (of which Dixon was not a mail room clerk but senior policy maker), we concluded that it could be fairly read, in the full context, as a statement that it was the *intention* of Powell and Pogue (described as "evil men") to exclude women—an intention *expressed* by Pogue and in the actions of the operating committee—and we admitted the statement under Rule 801(d)(2)(D). We nonetheless emphasized that the weight, if any, to be given to the statement was a matter to be considered upon submission of the case.

We now address the probative value of the statement in question. As we have said, Dixon was called as a witness by Halbrook, but was not asked about his delicatessen statement, and more importantly, its basis. Furthermore, on cross-examination, Dixon stated that in his long experience with Powell and Pogue, he "never heard" either of them suggest that a man was a more appropriate choice than a women for the general counsel's job, or any other managerial position for that matter. Tr. 327–28. Furthermore, he denied that Powell or Pogue ever said that there were problems with managing women. Tr.

328. We note parenthetically that Dixon's account of a 1985 statement he attributed to Pogue, to the effect that "managing men and women was different at different times and for different reasons," Tr. 1091–92, is not evidence of discriminatory intent, and reflects, in general terms, the view of Halbrook in connection with the question of how office hours might impact differently on women employees than men employees.

Perhaps the most obvious weakness in Dixon's purported delicatessen statement is that the net effect of his testimony is a denial, *sub silentio*, that he even said it. We cannot find in any of his testimony any arguable reading that a) Powell, Pogue and/or the Operating Committee intended to keep woman from top management positions at Reichhold, or b) the corporate culture, however abstractly one wishes to define it, operated to bring about such a result. Furthermore, an examination of the text of the statement, as reported by Halbrook, reveals that Dixon himself rooted his perception about the "corporate intention" in the "women are hard to manage" comment he attributed to Pogue in the delicatessen, but not at trial.

We additionally observe that at the time he made the asserted delicatessen statement, Dixon was deeply embittered toward Powell, and Reichhold generally, because he had been fired. Halbrook confirmed this (he was "upset about getting fired," Tr. 742); Pogue confirmed this (Dixon "was very angry and very bitter" and waved his finger in Pogue's face and cursed, Tr. 898–900); Powell confirmed this (Dixon was "irate" and "stormed out" of Powell's office, Tr. 1068).

Accordingly, we give the purported delicatessen statement of Dixon no weight, and reject it entirely as evidence of an illegal discriminatory motive in the decision to hire Lorelli.

### b. the employee inter-relationship seminars

We turn now to the employee inter-relationship seminars that Reichhold conducted in June 1984. These seminars were initiated by Powell, and were apparently de-

signed to encourage all of the employee participants, both supervisors and subordinates, to engage in a kind of group therapy out of which would presumably emerge a happier, more collegial, better informed, and more efficient work force, marching forward, arm in arm, toward self-fulfillment and greater profits for Reichhold. These meetings were referred to at various times in the record as "encounter sessions" (plaintiff's counsel, Tr. 454), "team building and role negotiation" seminars (plaintiff, Tr. 455), a process of "self analysis and [analysis of] people that you worked with" (plaintiff's counsel, Tr. 456), "psychological exercises" (plaintiff's counsel, Tr. 292), "[a mechanism] to get anything they had on their mind off their minds of a personal or other nature" (Dixon, Tr. 296), and "touchy-feely foolishness" (plaintiff's counsel, Tr. 750).

Halbrook points to the occasion of this "touchy-feely foolishness" as the source of two incidents evidencing discriminatory motive: one on the eve of the formal seminar session, dealing with "women's issues" in general during a conversation with Dixon and two other Reichhold managers, Jim Gentel and Tom Madden; and the other, during the session, dealing with the subject of maternity leave.

Dixon made two statements to Halbrook about "women's issues" generally. He encouraged her not to "let women's issues get in [her] way", PX 38, and requested that Halbrook, as part of their confidential seminar "contract", not "verbalize/insinuate that the 'women's issue' has impact on her advancement." PX 54. In her testimony, Halbrook asserted that these remarks were spurred by Dixon's "irritation" with her for bringing up issues about which she concedes he was in agreement with her: that more women should be hired, and that not playing golf was something Halbrook need not be concerned about. Tr. 760. She asserted that Dixon had stated at the seminar session that "it was not in [her] best interests to raise women's issues such as those at Reichhold." Tr. 467. This latter statement of the plaintiff is difficult to credit, in light of the context of the ongoing exchange between her and Dixon, that

he agreed with her that more women should be hired, and that golf would play no role in her advancement or lack of advancement. Indeed, on cross-examination, Halbrook acknowledged having given earlier deposition testimony that she had discussed with Dixon what he meant by not letting women's issues get in her way, and he had replied that "he was referring to my misperception on the golf issue." Tr. 760–61. Furthermore, Halbrook had acknowledged at the seminar that she had indeed misperceived the "golf issue." Tr. 756.

We reject the plaintiff's claim that Dixon in words or substance told her that it was in her best interests not to raise women's issues at Reichhold. We find that Dixon did say, in substance, that she should not verbalize or insinuate that her career was being adversely affected by the so-called golf issue, which he believed, in truth, was playing or would play absolutely no role whatsoever. Indeed, there is no evidence in the record whatever, that there was such a thing objectively as the "golf issue," that Powell played golf, that Powell played only with men and not women, or that promotions were tied to a golfer's gender. We also observe that Halbrook has never stated in this lawsuit that she had in fact been gagged in the seminar. We find it odd that only when plaintiff, a senior lawyer, and one whose duties included monitoring of EEO standards at the company, got to the witness stand at trial seven years after the asserted "threat" was pronounced, did she give precise evidence on the point.

At the time of the seminar in 1984, Halbrook was pregnant and shortly to go on maternity leave. Halbrook asked Dixon to agree to stop mentioning his concern that Halbrook might not return from leave and to state to those who asked that Halbrook would return. PX 54. Neither Powell nor Pogue ever asked Halbrook about her intent to return from maternity leave. Tr. 461, 1080–91. Nor did the fact that Halbrook would be going on maternity leave affect her advancement in the company. Indeed, the previous month, when Halbrook would have been three to four months pregnant, Dixon, Powell and Pogue

had all approved a promotion for her which Halbrook herself had described as "a huge move. They were making me an officer. They sent me letters congratulating me and I considered it a big step." Tr. 432.

Moreover, in October 1984, after the seminar and less than two months before the birth of her child, Dixon and Powell both signed a "1984 Career Development" form describing Halbrook as "ready in 1–2 years for increased responsibilities" giving every indication that they expected her to return to a successful career at Reichhold. PX 8. She also received her 1984 annual review in October, which was signed by both Powell and Dixon and was complimentary of her. DX D.

In addition, Halbrook's own testimony makes Dixon's concerns appear quite reasonable. At the same time that Dixon was asking Halbrook whether she would return from maternity leave, Halbrook was speaking frequently with Rosalie Lawlor, an associate general counsel who was already out on maternity leave, and was actively encouraging her to return to work. Tr. 591. Halbrook called Lawlor, visited her in the city, brought her work and offered advice on how to obtain child care. Tr. 593–94. Halbrook noted that Dixon too was concerned about Lawlor coming back, and admitted that she saw nothing inappropriate about his concern. Tr. 594–95. When Lawlor eventually decided not to return to Reichhold from her leave, Halbrook was disappointed, and told Lawlor so. Tr. 592. Halbrook did not feel that any of her actions with respect to Lawlor were offensive. Tr. 592–95. Nor did she find the "headhunter" Ruth Miles's question about her intent to return from a maternity leave she took in 1980 to be offensive. Tr. 591. As Halbrook conceded, such information is "absolutely" a legitimate interest of a placement person or employer. *Id.*

We find Dixon's concern about Halbrook's return from maternity leave not only wholly benign, in the context of a claim of illegal discriminatory intent, but a positive indication of the professional regard in which Reichhold held Halbrook. Indeed, this is further evidence that Dixon and Reichhold did not wish to be rid of an employee who, according to Halbrook, needed to be threatened and gagged at the seminar.

### c. Pogue's statements

Halbrook also cites statements she attributes to Pogue. In 1984, when she was seeking a place on one of the company's management committees, she was, according to her testimony, "belittled" by Pogue, Tr. 453, and told that she was experiencing "some kind of a syndrome about failure of success that women were having ... and he referred me to a book ... about women fearing success, failure based on fear of success." Tr. 454. Halbrook asserted that this reference arose in the context of Pogue's comment about a former female superior of his at a different company. Tr. 453–54.

Pogue emphatically denied that he had ever belittled, reproached or reprimanded her, Tr. 884, and, indeed, Halbrook conceded that such conduct as she described was totally out of character with the manner in which he treated her during the five years they worked together. Tr. 674. Pogue, who was a credible and convincing witness, stated that he did have a female superior at Diamond Shamrock, but that he "absolutely [did] not" discuss her with Halbrook. He also denied talking with Halbrook about fear of success in connection with this superior, as this superior had none, was then very successful, and still is so. Tr. 887–88.

We do not find in the evidence of this isolated and almost fragmentary exchange, which occurred more than three years prior to the promotion of Lorelli, any evidence of a discriminatory motive on the part of Reichhold.

### d. statistical evidence

The statistical evidence put forth by the plaintiff is manifestly inadequate to demonstrate pretext and need not be discussed at length. Halbrook produced no comparative statistics showing the incidence of women at companies in the petro-chemical, inorganic chemical, industrial chemical or related industries. Halbrook's numbers, they are not statistics in the for-

mal sense, showing that she was the only woman in the top echelon at Reichhold, and that only 15% of "managers and officials" at Reichhold are women, prove nothing.

Having examined Halbrook's proffered evidence in support of her charge that Reichhold's decision to promote Lorelli was motivated by a gender bias, we find the evidence insufficient and unconvincing. Thus, we conclude that Halbrook has failed to demonstrate that the legitimate business reasons given by Reichhold for the choice of Lorelli are pretextual.

### III. *Conclusion*

In the face of this record, we simply cannot find that the reasons proffered by Reichhold as the basis for Lorelli's selection as General Counsel are pretextual or unworthy of credence. Nor can we conclude that Reichhold had a discriminatory motive for promoting Lorelli instead of Halbrook.

Accordingly, the Clerk of the Court is directed to enter judgement in favor of the defendant, and the complaint is dismissed. No costs or attorneys fees to the defendant.

SO ORDERED.