**Marianne R. HURD, Plaintiff,**

v.

**JCB INTERNATIONAL CREDIT CARD CO. LTD., Defendant.**

**No. 94 Civ. 9093 (CBM).**

United States District Court,
S.D. New York.

April 15, 1996.

Raymond F. Gregory, New York City, for plaintiff.

Morrison & Foerster, Anthony M. Radice and William E. Zuckerman, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

Plaintiff in the instant case alleges that she was discriminated against in the terms and condition of her employment based on her age and sex. She also alleges that she was retaliated against for filing a complaint with the Equal Employment Opportunity Commission (EEOC) challenging defendant's allegedly discriminatory practices. Defendant has moved for summary judgment in this action, alleging that plaintiff has failed to raise a genuine issue of fact with regard to several essential elements of her case. Because the submissions in opposition to the instant motion raise several genuine issues of material fact in this action the request for summary judgment must be denied.

## BACKGROUND

### Summary of Plaintiff's Allegations

Plaintiff, a forty-eight-year-old woman at the time the amended complaint in this action was filed, was hired as a salesperson with defendant company in 1988 and fired in May of 1994. She claims that during the course of her employment she was denied a promotion based on her age and gender, retaliated against after filing a charge with the Equal Employment Opportunity Commission (EEOC) alleging discrimination in this promotion decision and ultimately terminated. Plaintiff alleges that the following facts and circumstances surrounding her employment raise an inference that she was discriminated against because of both her gender and age: 1) defendant intentionally used an arbitrary method of evaluating worker success in order to favor the less lucrative

sales younger men in her department were able to accomplish; 2) for most of her tenure with defendant she was the only woman in the sales department and she received serious disparate treatment, including, *inter alia,* grave reprimands for trivial infractions of office policies where much more serious violations of these same policies by younger men were overlooked; and, 3) she received degrading treatment in the office to which her younger male co-workers were not subject. It is alleged that this treatment created an atmosphere that not only made it impossible for her to receive promotions but also fostered the conditions necessary for defendant to establish a pretext for terminating her.

### The Parties.

Plaintiff Marianne R. Hurd (hereinafter "plaintiff") was hired by defendant company in May of 1988 to serve as its only salesperson in its new New York office. Prior to her appointment with defendant, she had fifteen years of sales experience. Her responsibilities with defendant involved securing and maintaining agreements from retail companies to accept the use of defendant's credit card by defendant's customers. (Hurd Aff. at ¶¶ 1–4; Krumme Aff. at ¶ 4).

Defendant JCB International Credit Card Co., Ltd. (hereinafter "defendant"), is the United States subsidiary of JCB International Co., Ltd., which, in turn, is a subsidiary of JCB Co., Ltd., "the largest bank-related credit card company in Japan and the fourth largest in the world." (Krumme Aff. at ¶ 2.) JCB is headquartered in Los Angeles with offices in several major U.S. cities, including New York. (*Id.* at ¶ 2–3.)

### Gender and Age Makeup of Defendant's Employees.

Plaintiff began her tenure with defendant in May 1988 as one of three employees at the New York office. Her co-workers were Mitsuo Funayama ("Funayama") and an administrative assistant. At the time plaintiff was hired, she was already over the age of 40. (Hurd Aff. at ¶¶ 39; Krumme Aff. at ¶ 5). In September of 1988, Nelson Reyes ("Reyes") was hired as the second salesperson in the New York office and, in April 1990, Douglas Bausch ("Bausch") its third. (Krumme Aff.

at ¶ 5.) Defendant states that the following appointments were also made at the New York office: John Murch was hired in 1992 after Reyes left in that year; Chiaki Tanaka ("Tanaka") was hired in April 1994; and Robert Findaro ("Findaro") was hired in August 1994, two months after plaintiff was fired. (Krumme Aff. at ¶ 5.)

Plaintiff alleges that personnel figures reveal that defendant's management and senior staff members were predominantly male and that employees at plaintiff's level were all significantly younger than plaintiff and mostly male. (Hurd Aff. at ¶¶ 39–41.) It is clear that for most of plaintiff's tenure with defendant, plaintiff was the only older woman in sales, because defendant hired several younger males. (Hurd Aff. at ¶¶ 39–40; Krumme Aff. at ¶ 5.) The only woman who appears to have been hired by defendant for a position in the sales department was Tanaka who began working for defendant in April 1994, i.e., one month before plaintiff's termination. (Krumme Aff. at ¶ 5.) Additionally, plaintiff alleges that higher level management is overwhelmingly male. (Hurd Aff. at ¶ 41.) Although defendant disputes these allegations and provides figures that reveal no significant disparities, plaintiff argues that defendant's counter-allegations are biased because defendant has manipulated the data by excluding all of those management positions that appear to be filled by employees of defendant's parent company in Japan. (Krumme Aff. at ¶ 32 and Def.Exh. N.) The court has not been given sufficient information to resolve the dispute regarding the statistical data presented; plaintiff must be given the benefit of the doubt at this stage of the litigation on this point. In any event, despite this confusion over the personnel figures throughout the company, it appears that each of plaintiff's peers in the sales department, at least up to the last month of her employment, was a younger male.

### Plaintiff's Employment Evaluations.

Each year, salespersons and other staff are given annual performance reviews in which they are judged on a scale of 1 to 10 (with 10 the highest and 1 the lowest ranking) in ten different categories, including,

*inter alia,* sales in terms of "Profit/Efficiency Impact", "Expense Control", etc. (Hurd Aff. at ¶ 5; Krumme Aff. at ¶ 8; Def. Exhs. 7–9 [1] ).

Both parties admit that plaintiff's initial performance ratings were very high. (Hurd Aff. at ¶ 5; Pl.Exh. A (1989 Performance Evaluation); Krumme.Aff. at ¶ 9). In her first evaluation, which covered the period from May 1988 through December 1989 and was prepared by Funayama, plaintiff received a "9" as an overall score, which is considered "outstanding". Additionally, Funayama wrote in this evaluation that "[h]er ability is above the standard of Assistant Vice President" and recommended her for promotion. (Pl.Exh. A at 2.)

Days after her evaluation, Dwane Krumme, General Manager and Executive Vice President of JCB, sent a confidential letter to Funayama's home, setting forth his reservations concerning plaintiff and the high ratings Funayama had given her. In this memorandum, (hereinafter the "Krumme Memorandum"), Krumme praised Funayama for his "intellectual and objective" appraisal which was "warranted, as opposed to an evaluation based upon emotional feelings about her style." Krumme informed Funayama, however, that "[i]n *American* performance evaluations" such a high rating is "extremely rare" and that plaintiff's "personal style" should be taken into account. (Pl.Ex. B at 1 (Krumme Memorandum) (emphasis added).) Krumme noted some examples where co-workers and customers had expressed dissatisfaction with plaintiff resulting from plaintiff's "personal mannerisms, which are often too strong and over bearing (sic) in conversations with fellow staff members and with customers." (*Id.*) Krumme added that plaintiff's "personal characteristics should not detract from her accomplishments, both her accomplishments and her personal deficiencies need to be taken into consideration in a performance appraisal." (*Id.* at 2.) He stated that no employment action was necessary with regard to plaintiff provided Funayama would keep her in the sales department. If she was to be promoted, however, counseling would be necessary. (*Id.*) Lastly, although stating he would rate plaintiff "less than a 9–10," he praised Funayama for his "professional attempt to provide an objective assessment of her capabilities, *which is the most important consideration overall.*" (*id.* at 3 (emphasis added).)

The next year's assessment was made by Funayama again, but with "more input from [Krumme] and other managers in the Los Angeles office than when [Funayama] reviewed [plaintiff] the prior year." (Krumme Aff. at ¶ 10.) Plaintiff describes this next review as "devastating" and "absurd". (Hurd Aff. at ¶¶ 8 and 10.) Her ratings dropped from "outstanding" to "marginal" and "meets req[uirement]" even though, as plaintiff argues, her sales were still high. (Hurd Aff. at Exh. C.) Moreover, as plaintiff argues, "[e]ven skills that do not change from one year to the next were given drastically reduced ratings." For example, in the category "Communication—clarity and accuracy of oral and written communications", plaintiff's score was reduced from a "9" to a "4". (Hurd Aff. at ¶ 10.)

Plaintiff's subsequent evaluations were never as strong as her first and were generally as weak as her second. Soon after the Krumme Memorandum was issued, Bausch was hired as another salesperson in the New York office. (Hurd Aff. at ¶ 13.)

**Defendant's Method of Evaluating Sales Performance.**

Plaintiff alleges that when compared to the other salespersons in her office, the quality of her work was far superior and the ultimate output much greater. The main reason for the poor evaluations, she argues, is the manner in which defendant would consider the productivity of its salespersons.

Plaintiff's main customers appear to have been large merchant chains: one with over twelve hundred outlets. At the same time, the other salespersons (all younger men) were engaged in attempts to sign up smaller

1. Defendant's exhibits are found annexed to the Affidavit of Anthony M. Radice, Esq.; plaintiff's exhibits are annexed to her affidavit.

companies, some with just one outlet. (Hurd Aff. at ¶ 16.) Plaintiff asserts that any manner in which the sales output is reviewed, either through actual number of outlets or total revenue generated, plaintiff's sales were extraordinary and much higher than her colleagues. (Hurd Aff. at ¶ 22, 24–26.) At the same time, the only method by which her productivity would seem lower than her colleagues was one which counted the number of agreements secured, regardless of the size of the merchant or the revenue such sale generated.

Plaintiff argues that defendant utilized this latter, wholly irrational system intentionally in order to devalue her productivity, exclude her from promotion and ultimately terminate her employment. Moreover, plaintiff argues that the implementation of this policy actually discriminated against her as an older woman, as younger men were able to appear—based on this system of rating productivity—to be doing a better job than plaintiff, even though any reasonable analysis would show otherwise.

Plaintiff argues quite succinctly as follows: The quality of the merchant, the enhanced credibility JCB would gain by securing that merchant, the number of outlets becoming available under such an agreement and the revenue generated through that merchant are paramount considerations in evaluating sales performance. By changing the emphasis in my case to the number of agreements obtained as a measure of my performance, JCB deliberately chose to make it impossible for me to achieve a just performance evaluation. I was the only sales person consistently engaged in securing large, nationwide retail chain accounts, which JCB very much appreciated getting. Funayama and Krumme were well aware that a great deal of competence and effort were required to secure accounts of this stature, and that it was a time-consuming process, demanding a great deal of patience, negotiating skill and dedication to duty. In total disregard of the noteworthy contribution I made,

JCB now insists that the number of new agreements secured was an appropriate measure of my performance. This new criterion favored the more junior, young salesmen, while penalizing me, since they secured far fewer outlets but tended to sign more agreements with small, unknown stores.

(*Id.* at ¶ 16.)

Plaintiff reveals several internal contradictions in defendant's purported methodology. In both the first evaluation and the one conducted in 1992, plaintiff was given high praise for the quality[2] of the merchant agreement secured, regardless of the actual number of agreements obtained. (Hurd Aff. at ¶ 17; Pl.Exhs. A and G.) Moreover, in the 1992 evaluation, it is noted that although plaintiff's goal was to secure 110 merchant agreements she only obtained 50 but was rated as having exceeded her sales requirement and praised for doing a "fine job" because of the profits generated from such sales. (Hurd Aff. at ¶ 17; Pl.Exh. G. at 3). Similarly, plaintiff points to two internal staff memoranda from Funayama that discuss sales goals in terms of the revenue such sales will produce. (Hurd Aff. at ¶ 21; Pl.Exhs. J and K). One of these memoranda states that the goals set by the company, for both merchant agreements *and* number of outlets, would be impossible to achieve "[w]ithout recruiting chain merchants." (Pl.Exh. J at 1.)

In addition, in his own sales summary report for fiscal year 1992–93, Bausch reviewed his personal accomplishments for that period, stating "[t]his year I have concentrated not so much on the amount of merchants that I signed but on the increase of sales, maintenance, *and the quality of merchants signed*." (Hurd. Aff., Exh. M at 1 (emphasis added).)

Moreover, plaintiff also alleges that at least one of the purported methods for assessing productivity adopted during her tenure was dropped immediately after her departure. In the spring of 1993, plaintiff reached an agreement with a retail chain store with over 1,200 outlets. The following

---

**2.** Plaintiff's argument implies that the term "quality" denotes the size of the merchant in terms of outlets and the revenue the merchant

will produce for defendant's business. (Hurd Aff. at ¶ 17.)

summer, defendants adopted a "30 outlet rule" that limited to 30 the maximum number of outlets for which a salesperson would receive credit in a single sale, regardless of the actual number of outlets covered by the agreement reached. Defendants applied this new "rule" to the agreement plaintiff had secured months earlier. (Hurd Aff. at ¶¶ 19–20.) During his deposition, Bausch could not recall whether this rule was still in effect after Hurd's termination. (Hurd Aff., Exh. T at 318.) Plaintiff concludes that "this '30 outlet rule' was devised to undermine and nullify my success, as no other sales person in the New York office (and probably the entire company) was thus adversely affected." (Hurd Aff. at ¶ 20.)

Given these facts, plaintiff asserts that defendant "is relegated to relying upon irrational and unjustifiable criterion to attack my performance.... [Its] reliance upon the number of merchant agreements secured clearly is pretextual." (Hurd Aff. at ¶ 26.)

### Plaintiff's "Interpersonal" Problems.

Defendant raises plaintiff's "interpersonal" problems as another basis for her poor evaluations. She is cited for not being able to get along with others and being generally "uncooperative and insubordinate." (Def.Mem.Supp.Mot.Summ.J. at 9.) When she was criticized for lateness, defendant argues that her response was "hostile." (Krumme Aff. at ¶ 18.) Additionally, in one of defendant's evaluation reports of plaintiff, it was noted that plaintiff had to be more cooperative with staff and that she "[t]ends to overreact under stressful situations." (Def.Exh. 3.) Another review cited her for being too argumentative, having too strong an ego, and being too opinionated. (Def.Exh. 9.)

Plaintiff denies defendant's characterizations of her tenure with defendant. (Hurd Aff. at ¶¶ 27–29.) Moreover, she states that many of defendant's allegations are based on the fact that defendant was offended because of plaintiff's challenges to treatment plaintiff

considered "unacceptable, as well as discriminatory." (Hurd Aff. at ¶ 29.) For example, defendant complains about her memorandum in response to being chastised for arriving to work late, but plaintiff asserts that she was singled out for coming in at 9:01 and 9:02 a.m., for a work day that started at 9:00 a.m., while "male members of the sales staff ... were late far more frequently than I ... [T]heir late arrival times were more like 9:20 a.m. or 9:40 a.m. ... [and] none of the young men ever received disciplinary notices." (*Id.*) Similarly, defendant cites several incidents between plaintiff and staff as well as plaintiff and customers as examples of plaintiff's poor interpersonal skills, but the facts surrounding these incidents are in dispute. (*See* Def.Mem.Supp.Mot.Summ.J. at 10–11; Hurd Aff. at ¶ 27.)

### Denial of Promotion.

In 1993, defendant created a sales supervisor for the New York office and promoted Bausch over plaintiff. At the time of Bausch's promotion, he had two years' less experience with defendant than plaintiff. Defendant argues that Bausch had more experience working for credit card companies than plaintiff, having worked at one for the four years prior to his employment with defendant. (Def.Mem.Supp.Mot.Summ.J. at 29–30.) In addition, relying on defendant's evaluations of plaintiff and Bausch, defendant argues that Bausch's evaluation reports were stronger.[3]

Plaintiff contends that defendant failed to take into account her two years' greater experience with defendant and that Bausch's prior experience in the "credit card" industry bore no significant relationship to defendant's business and that the evaluations regarding sales output were biased against her given the improper method utilized. (Pl. Mem.Opp.Mot.Summ.J. at 32–33 and exhibits referred to therein.)

### Retaliatory Acts.

In December of 1993, plaintiff filed a charge of discrimination with the EEOC, al-

---

**3.** Defendant supplies a chart setting forth the scores received by plaintiff and Bausch in their 1993 evaluations. In six of the ten categories Bausch scored higher than plaintiff, in the other four categories, they were even. In "External

Relations" and "Communication", two of the areas cited by defendant as plaintiff's weak points, both Bausch and plaintiff received the same scores. (*See* Def.Mem.Supp.Mot.Summ.J. at 13.)

leging that she had been discriminated against on the basis of gender and age because of the method of evaluation utilized by defendant and the denial of promotion. (Pl. Mem.Opp.Mot.Summ.J. at 37.) It is alleged that one month after filing this charge, plaintiff began to suffer retaliation for this act. First, she was re-assigned to a cubicle right next to Bausch's so he could monitor her closely, even though she was the most senior sales staff member in the office. Second, she was given a warning notice describing several incidents that purportedly exhibited plaintiff's mishandling of clients and assignments, allegations plaintiff states were complete fabrications which she refuted in writing immediately after receiving the warning. (Hurd Aff. at ¶¶ 34–35; Pl.Exh. W). Third, plaintiff alleges that in one of her evaluations she was not given credit for having obtained at least one large merchant agreement. (Hurd Aff. at ¶ 36). Additionally, she was accused of having assaulted Bausch, although both sides disagree substantially about the facts surrounding this incident.[4] Plaintiff argues that each of these acts were humiliating to her, a senior member of the sales staff, and were carried out for the purpose of retaliating against her for filing the EEOC charge. ·

### Termination.

Plaintiff was terminated the day after the incident of physical contact between plaintiff and Bausch. The termination notice stated that she was fired for not having met her sales targets. Additionally, her "conduct and attitude" were also cited as having "contributed" to the decision, including the incident involving Bausch. (Def.Exh. M. at 1–2.)

Several months after plaintiff was fired, defendant hired Robert Findaro, a younger male, as a salesperson. (Hurd Aff. at ¶¶ 40, 42.) Defendant alleges that no one was hired to "replace" plaintiff, only that her responsibilities were divided between Findaro, Tanaka (a woman), and Bausch. (Def.Mem.Supp.

Mot.Summ.J. at 20; Bausch Dep. at 314–15; Krumme. Aff. at ¶ 5).

### ANALYSIS

## I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

Defendant has moved for summary judgment, stating that plaintiff has failed to establish a *prima facie* case of either gender or age discrimination because she has failed to establish that she was qualified for the promotion ultimately given to Bausch. Defendant also argues that plaintiff's *prima facie* claim of retaliation is also flawed because plaintiff can establish no causal connection between any acts taken against her and her filing of a charge with the EEOC. Additionally, defendant alleges that it has articulated legitimate reasons for its employment decisions and plaintiff cannot show that these are interposed as mere pretext for discrimination or that the facts and circumstances of the case give rise to a finding of discrimination. The court shall deal with each of these arguments in turn.

### A. Summary Judgment Standard.

A motion for summary judgment shall only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

---

4. Although defendant alleges that plaintiff "intentionally, physically bumped [Bausch] quite forcefully . . .", plaintiff alleges that a co-worker had been walking in and out of plaintiff's cubicle without reprimand from Bausch and thus plaintiff was simply trying to show Bausch how disruptive it was to have someone walking in and out of a cubicle. (Def.Exh. M at 2 (termination

letter)). Plaintiff alleges that when she attempted to demonstrate this to Bausch by walking past him as he was sitting in one of the cubicles, she accidentally brushed against him. Bausch admitted that plaintiff had intended to convey this message to Bausch by walking past him as she did, even though she bumped into him. (Pl.Exh. T (Bausch Dep.) at 166; Hurd Aff. at ¶ 37).

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.,* at 323, 106 S.Ct. at 2552. When considering a motion for summary judgment, the court must view the inferences to be drawn from the facts in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In order to defeat the motion the non-moving party must still establish the existence of a genuine issue of material fact for trial and may not merely rely upon the pleadings in order to overcome the motion. Fed.R.Civ. Proc. 56(e); *Celotex Corp.,* 477 U.S. at 322–324, 106 S.Ct. at 2552–2553.

### B. Evidentiary Burdens in Employment Discrimination Actions.

Title VII of the Civil Rights Act of 1964 provides in relevant part:

> It shall be an unlawful employment practice for an employer—(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. s 2000e–2(a).

██ In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court established "an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993) (footnote omitted). Under the standards set forth in *McDonnell Douglas,* plaintiff must first prove by a preponderance of the evidence a "prima facie" case of racial discrimination. 411 U.S. at 802, 93 S.Ct. at 1824. This "creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once the plaintiff has established this presumption, the defendant has "the burden of producing an explanation to rebut the prima facie case—i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Hicks,* 509 S.Ct. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S., at 254, 101 S.Ct. at 1094). At this stage, the defendant "'must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254–255 and n. 8, 101 S.Ct. at 1094–1095 and n. 8.) Accordingly, once defendant carries this burden of production, plaintiff must show that the decisions articulated for the adverse decision were pretextual, and that plaintiff was the victim of discrimination. *Hicks,* 509 U.S. at 507–10, 113 S.Ct. at 2747–48. As reiterated by the Court in *Hicks,* however, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093) (alteration in original). This burden shifting analysis has been applied to the ADEA context as well. *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994).

██ When confronted with a motion for summary judgment by an employer in employment discrimination cases such as the matter *sub judice,* the employee-plaintiff must prove the following:

> a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Gallo, supra,* 22 F.3d at 1225 (citations omitted and emphasis in original). "Summary judgment is ordinarily inappropriate in a Title VII action where a plaintiff has established a *prima facie* case." *Smith v. Ameri-*

*can Express Co.,* 853 F.2d 151, 154 (2d Cir. 1988) (citation omitted).

## C. Plaintiff's *Prima Facie* Case of Discrimination.

In order to establish a *prima facie* case of employment discrimination under Title VII, plaintiff must show: 1) that she belongs to a protected group; 2) that she was qualified for the position she held; 3) that the adverse employment decision occurred under circumstances giving rise to an inference of discrimination. *See, e.g., McDonnell Douglas* 411 U.S. at 802, 93 S.Ct. at 1824. In age discrimination suits under the ADEA, plaintiff makes out a *prima facie* case by showing: 1) she is 40 or more years of age; 2) she was qualified for her position; 3) she was the victim of an adverse employment decision under circumstances giving rise to an inference of discrimination. *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.,* 964 F.2d 106, 110–111 (2d Cir.1992).

### 1. Standing.

In the instant suit, plaintiff has met the first element of these tests because she is a woman who is over forty years of age. *See, e.g., McDonnell Douglas* 411 U.S. at 802, 93 S.Ct. at 1824; *Maresco,* 964 F.2d at 110–111.

### 2. Qualifications.

With regard to her qualifications, she has clearly raised a genuine issue of material fact on this issue given that she has alleged that her performance on almost every scale but the arguably irrational one utilized by defendant far exceeded the performance of her younger male counterparts. She shows that although her ratings dropped after her first "outstanding" overall rating in the 1990 evaluation, most were still in the "meets requirement" range and only a small fraction of the grades she received over the next three years were ever in the "unsatisfactory" range. (Hurd Aff. at Exhs. C, G, H, and I.) Similarly, in the last several months of her

employment she alleges to have secured a large merchant agreement that promised defendant significant revenues. (Hurd Aff. at ¶ 30(h).)

One cannot overlook the fact that at the heart of plaintiff's case is her charge that the evaluation scheme was itself biased and thus should not be used as a way to disprove her qualification for the job. In support of her arguments, plaintiff raises serious questions about the validity of the methodology employed by defendant that certainly raise a genuine issue of fact that it was utilized in such a way to single her out for poor evaluations in favor of the other salespersons who were—for most of plaintiff's tenure with defendant—all younger men.[5]

Additionally, defendant cites "interpersonal problems" which plaintiff denies across the board, thereby raising a genuine issue of material fact as to whether she had sufficient interpersonal skills to qualify for the job.[6] Defendant cannot consider plaintiff's alleged vitriolic response to what she, perhaps rightly, perceived as abuse as evidence of her "interpersonal problems" and "insubordinate" attitude. Moreover, as described above, many of the proffered examples of plaintiff's poor work habits or poor interactions with co-workers and customers are either wholly denied by plaintiff or actually illustrate the ways in which similar behavior by younger, male co-workers was ignored. Accordingly, plaintiff has raised genuine issues of material fact with regard to her qualifications for her position.

### 3. Inference of discrimination.

Similarly, there are genuine issues of material fact in dispute with regard to whether the facts and circumstances surrounding the treatment suffered by plaintiff are sufficient to raise an inference of discrimination.

---

5. The problems arising from defendant's use of its evaluation system are more fully set forth in the discussion regarding the purported pretextual nature of defendant's reason for taking the employment actions against plaintiff challenged herein. *See* Discussion, *infra* at § I., D.

6. Once again, it is difficult to separate the discussion concerning plaintiff's qualifications for the job from her argument that defendant's position regarding her interpersonal problems was merely pretextual. *See infra,* § I., D.

Plaintiff has shown that defendant's method of evaluating worker productivity singled her out for poor ratings by failing to take into account her important accomplishments, favoring other—arguably arbitrary—indicia of productivity. Defendant argues that plaintiff's real grievance is that she simply disagreed with management's business decision to choose one method of evaluation over another.

As set forth above, however, plaintiff raises serious questions about the validity of defendant's evaluation method: that they were applied retroactively to diminish her productivity; that they did not always enforce them against other young male employees; and that after plaintiff's termination defendant no longer utilized the same standards. Similarly, with regard to plaintiff's purported interpersonal problems, she has effectively shown that she suffered from treatment that was not applied to the young male salespersons and that many of defendant's complaints about insubordination arise in the context of disputes over plaintiff's work habits. Accordingly, plaintiff has raised an inference of discrimination sufficient to establish a *prima facie* case of discrimination under Title VII and the ADEA. *See, e.g., Gallo,* 22 F.3d at 1227 (holding plaintiff, employee terminated in purported corporate downsizing, establishes inference of discrimination where employer chooses to re-assign or hire several younger employees with less experience than plaintiff).

### D. Plaintiff's *Prima Facie* Case of Retaliation.

▉▉ To establish a *prima facie* case of retaliation under Title VII and the ADEA, plaintiff must prove: that she was engaged in protected activity under these laws, that she suffered adverse action, and that a causal connection exists between the two. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). In such situations, the causal connection between the adverse action and the protected activity can be shown through indirect evidence, such as close proximity in time between the protected activity and the adverse employment action. *See, Grant v. Bethlehem Steel Corp.* 622 F.2d 43, 46 (2d Cir.1980) (discussing proof for retaliation claim under Title VII). Moreover, plaintiff's burden on this claim at this stage of the litigation is "de minim[i]s." *Tomka, supra,* 66 F.3d at 1308 (citation omitted and alteration in original).

▉▉ As set forth above, plaintiff filed a charge with the EEOC in December of 1993, alleging that she was the victim of discrimination on the basis of gender and age because of the method of evaluation utilized by defendant. Plaintiff alleges that one month later she began to suffer retaliation for her actions as follows: 1) she was re-assigned to a cubicle right next to Bausch's, so he could monitor her closely, even though such a location represented junior status in the office when she was the most senior sales staff member there; 2) she was given a warning notice describing several incidents that purportedly exhibited plaintiff's mishandling of clients and assignments which plaintiff alleges were complete fabrications (Hurd Aff. at ¶¶ 34–35; Pl.Exh. W); 3) plaintiff alleges she was not given credit for having reached at least one large merchant agreement (Hurd Aff. at ¶ 36); and, 4) she was accused of having assaulted Bausch, which she disputes. Plaintiff argues that each of these acts were humiliating and carried out in retaliation for her filing the EEOC charge. (Hurd Aff. at ¶ 33–38.)

As the Second Circuit stated clearly in *Tomka, supra,* a close correlation in time between the protected act and the purported retaliatory treatment "supports an inference of discrimination sufficient to establish a prima facie case." 66 F.3d at 1308 (citations omitted). Accordingly, plaintiff has established a *prima facie* case of retaliation.

### E. Defendant's Articulated Reasons for Termination, Plaintiff's Allegations Regarding Pretext and the Arguably Discriminatory Inference that can be Drawn from the Facts.

▉▉ Defendant asserts as its basis for not promoting and ultimately terminating plaintiff that "her sales efforts and performance [were] unsatisfactory, and her insubordinate conduct intolerable." (Def.Mem.Supp.Summ.J. at 33.)

As stated above, plaintiff has raised a genuine issue of material fact that permeates the entire action: that defendant's method of measuring the productivity of its sales staff singled her out and devalued her contribution. It is well-established that an employer may rely upon supervisor evaluations to assess an employee's performance when carrying out an employment decision. *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). As articulated by plaintiff, however, by considering the small, less time-consuming agreements the younger salesmen were able to obtain as equivalent to the those plaintiff sought, defendant intentionally undervalued plaintiff's work.

As further evidence of the pretext of the methodology, plaintiff cites the following examples: that it was applied retroactively to diminish the value of her sales, that management's statements to staff are riddled with inconsistencies concerning defendant's priorities regarding productivity, that plaintiff's colleague and future supervisor was able to emphasize his productivity in a way that plaintiff was not able to treat her own, that after plaintiff's termination defendant dropped some of the standards purportedly applied to sales during plaintiff's tenure. As described in plaintiff's version of the facts, defendant's systematic implementation of various "rules" concerning productivity that appear to have had an impact only on plaintiff, their selective enforcement of those rules, and their subsequent abandonment of certain criteria, could easily lead a finder of fact to determine that these standards were pretextual. *See, e.g., Gallo*, 22 F.3d at 1225 (holding "systematic resurrection" after employee's termination of tasks employer had originally eliminated to justify action against employee raised inference of discrimination); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994) (holding that based upon discrepancies in defendant's articulated basis for discrimination reasonable juror could infer that these were pretextual and "developed over time to counter" evidence suggesting discrimination).

Additionally, plaintiff denies the allegations of "interpersonal problems", raising genuine issues of material fact on this point. Moreover, many of defendant's arguments that plaintiff was insubordinate arise in the context of memoranda between the parties during her employment in which she is critical of the allegedly discriminatory conduct she has received: i.e., when she is being chastised for coming to work minutes late in the morning when her younger male counterparts are allowed to arrive significantly later without reproach. Defendant's arguments to the contrary notwithstanding, there is nothing in the law that says that a person suffering discrimination must stand mute in the face of invidious treatment.

Defendant's reliance on *Smith v. American Express Co., supra*, is misplaced. In *Smith*, the employer had alleged that the employee-plaintiff was denied a promotion that went to a co-worker because of the co-worker's better performance ratings and interpersonal skills. As is alleged by plaintiff herein, Smith alleged that the employee rating system used by American Express was invalid and biased. 853 F.2d at 154–155. This claim was rejected at the summary judgment stage as unsupported by the record. Here, however, by referring to the written memoranda of managers Funayama and Bausch, plaintiff has revealed that defendant's employee evaluation system was riddled with internal inconsistencies and what appear to be *ex post facto* justifications that, at a minimum, raise a genuine issue of material fact that defendant's methodology for evaluating its employees was indeed biased against plaintiff.[7]

---

7. Similarly, *Halbrook v. Reichhold Chemicals, Inc.*, 766 F.Supp. 1290, 1295 (S.D.N.Y.1991), relied upon by defendant, offers no support to defendant's case at the summary judgment stage of the litigation. There the district court determined, after bench trial, that plaintiff's scant and inconclusive allegations regarding discriminatory animus were insufficient to overcome the legiti-mate decision to promote one employee over another based on the former's better qualifications for the post. 766 F.Supp. at 1299–1302. Here, applying the "genuine issue of material fact" standard, plaintiff's allegations are sufficient to call into question defendant's bases for the employment actions challenged herein.

Accordingly, plaintiff has established a genuine issue of material fact that defendant's articulated reasons for failing to promote and for terminating plaintiff are pretextual. Additionally, as stated earlier, plaintiff has established a genuine issue of material fact concerning the inference that can be drawn regarding whether she was fired based on her age and gender.

As is well-established, the same facts may be relied upon to prove both a *prima facie* case of discrimination as well as to prove such discrimination by a preponderance of the evidence. *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749.

In interpreting *Hicks, supra,* the Second Circuit has stated definitively as follows:

> [Defendant] misreads the Supreme Court's statement in *Hicks* that once a defendant produces evidence of a legitimate, nondiscriminatory reason for his or her action, the plaintiff must then establish that the defendant's actions were intentionally discriminatory. [Defendant] takes this statement as requiring the plaintiff to adduce *additional* evidence after the defendant's production—evidence beyond that presented in the plaintiff's *prima facie* case. Justice Scalia took pains to preclude such an interpretation of the Court's decision when he observed that, upon rejection of the defendant's proffered reasons for its action, "no additional proof of discrimination is required." Thus, [plaintiff] did not fail to offer sufficient evidence of discrimination by not presenting more evidence after [defendant] endeavored to provide a nondiscriminatory reason for his actions.

*Cabrera v. Jakabovitz,* 24 F.3d 372, 385 (2d Cir.) (quoting *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749) (emphasis and alterations to *Hicks* quotation in original), *cert. denied,* —— U.S. ——, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994).

Moreover, the trier of fact can decide not only that the reasons proffered by defendant are pretextual but can also "generally infer discrimination when it finds that the employer's explanation is unworthy of credence." *Binder v. Long Island Lighting Co.,* 57 F.3d 193, 200 (2d Cir.1995). *See also, Ethan Allen,* 44 F.3d at 120 (holding that a "finding of

pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 142 (2d Cir.1993) (holding plaintiff's ultimate burden of proof can be met by "combining" proof submitted in its *prima facie* case with "evidence that defendant's proffered reasons for its acts were false."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 170 (2d Cir.1993) (holding defendant's proffer of a false reason for employment action sufficient basis for trier of fact to find that such action was "motivated by an improper discriminatory intent.")

Plaintiff has raised sufficient genuine issues of material fact regarding defendant's basis for the employment decisions challenged herein and whether such decisions give rise to an inference of discrimination that would warrant a finding of discrimination. *See supra* § I., C.

Given the Second Circuit's general admonition that "caution must be exercised in granting summary judgment where an employer's intent is genuinely in issue," *Tomka,* 66 F.3d at 1309–1310 (citations omitted), the court is not ready to conclude on the facts before it at this stage in the litigation that no reasonable juror could find that defendant discriminated against plaintiff in taking the adverse employment action challenged herein.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment should be denied.

### ORDER

For the reasons set forth in the Opinion filed simultaneously herewith, defendants' motion for summary judgment is DENIED.

So Ordered.