**Mary Louise HASKELL, as Executrix of the Estate of Weston B. Haskell, Jr. and Individually, Plaintiff-Appellee-Cross-Appellant,**

v.

**KAMAN CORPORATION, Defendant-Appellant-Cross-Appellee.**

**Nos. 1368, 1429, Dockets 84–7147, 84–7159.**

United States Court of Appeals, Second Circuit.

Argued June 18, 1984.

Decided August 15, 1984.

John S. Murtha, Hartford, Conn. (John C. Yavis, Jr., Lissa J. Paris, Murtha, Cullina, Richter & Pinney, Hartford, Conn., of counsel), for defendant-appellant-cross-appellee Kaman Corp.

Paul W. Orth, Hartford, Conn. (Hoppin, Carey & Powell, Hartford, Conn., of counsel), for plaintiff-appellee-cross-appellant Haskell.

Before MANSFIELD, MESKILL and CARDAMONE, Circuit Judges.

MANSFIELD, Circuit Judge.

Defendant Kaman Corporation (the "Company") appeals from a judgment of the District of Connecticut, José A. Cabranes, *Judge*, awarding plaintiff Weston B. Haskell, Jr., $283,000 compensatory damages, $40,000 special damages, and $87,566 in attorney's fees and costs pursuant to a jury determination that the Company unlawfully terminated Haskell's employment on account of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34. On appeal, the Company argues that the district court erred in denying its motion for a judgment notwithstanding the verdict, in admitting certain allegedly prejudicial testimony into evidence over its objection, and in failing to instruct the jury that it must find that Haskell was replaced by a younger person. Haskell cross appeals, arguing that the district court erred in not ordering a new trial on the question of whether the Company's actions were willful, entitling him to liquidated damages. We reverse and remand for a new trial on the question of whether Haskell's discharge violated the ADEA. We affirm the judgment denying Haskell liquidated damages.

Charles Kaman ("Kaman") founded the Company in 1945 for the purpose of developing and manufacturing a new military helicopter. At the outset, the Company had only three employees. By the early 1960's these increased to approximately 4500 employees, nearly all of whom were engaged in the manufacture of helicopters. However, the Company's helicopter operations began to decline in the mid-1960's, leading it to diversify its operations. It developed an acoustical fiberglass-backed guitar that became the largest seller of its kind, produced parts and assemblies for commercial and military aircraft, and serviced commercial aircraft at various airports in Connecticut, Nebraska, and Florida. In the early 1970's it entered into two new businesses: the sale and distribution of bearings and the distribution of musical instruments. By 1978, the bearing business accounted for about 40 percent of the Company's total sales and about one-half of its total profits. By the mid-1970's it had five major product groups—aerospace

products, sciences, aviation services, music, and bearing sales and distribution—and 17 subsidiaries. By 1978 it had 3,700 employees and annual revenues of $214 million.

Haskell joined the Company in 1958 as an assistant to the president, Kaman. Throughout his twenty-year tenure with the Company Haskell worked in public and investor relations and reported directly to Kaman. Until 1971, Haskell was director of public relations; thereafter, he was a vice-president. Haskell's most important job responsibility was the production of the annual report. As the Company grew and diversified, the reports became more elaborate and the task of coordinating the production of the report with the five product heads more difficult. Moreover, in addition to producing the annual report, Haskell oversaw the production of the Company's annual 10–K report for the Securities Exchange Commission and coordinated press and investor relations and corporate advertising. From 1973 until March 1978 an outside public relations firm, Lowengard & Brotherhood, selected by Haskell, assisted him in the Company's corporate advertising and investor relations program.

During Haskell's last years with the Company, there were problems with the production of the annual report. In 1972, the Company had to reprint the report because of the poor print quality of the photographs reproduced in it. Because Haskell was on vacation at the time, others in the Company oversaw the corrections. In 1974, the annual report failed to identify itself as such on its cover. More serious problems accompanied the 1976 report. The discussion of the music division was later deemed to be inadequate and several pages of the report had to be re-written and reprinted, causing delays in the mailing of the report to the shareholders. In the aftermath of the problems with the 1976 report Kaman placed Lucian Baldwin in charge of the production of the 1977 report and 10–K statement, with Haskell serving as Baldwin's assistant.

Early in 1977 Kaman became angry with Haskell over another incident. A news account had appeared in the local press alleging the contamination of a community well in Moosup, Connecticut, by a Company plant. Kaman blamed Haskell, who was in charge of press relations, for the unfavorable coverage. Haskell decided to tape his future telephone conversations with reporters; this further incensed Kaman who ordered Haskell not to tape anyone ever again.

The 1976 annual report and the Moosup well incident strained relations between Haskell and Kaman. Haskell conceded at trial that he and Kaman were having "difficulty communicating" following these mishaps. At the end of 1977 the Company cut Haskell's annual bonus from $10,000 to $5,000, with a net result that Haskell's annual compensation in 1977 was the same as in 1976. Haskell was the only Company officer whose compensation did not increase in 1977. The Company's corporate guidelines indicate that a $5,000 bonus suggests "above average" job performance, whereas a $10,000 bonus suggests "outstanding" performance.

In 1978 Haskell was involved in another incident that disturbed Kaman. The Company's public relations firm, Lowengard & Brotherhood, telephoned security analysts and bankers who had attended a November 1977 presentation by Kaman and asked them for their candid opinion of Kaman's presentation. Lowengard & Brotherhood tape-recorded their replies without their knowledge and sent the results to Haskell on February 6, 1978. Haskell passed the report along to Kaman without comment. Shortly thereafter Kaman met with other senior officers of the Company concerning Haskell and decided to fire him. On April 7, 1978, Kaman told Haskell that he was fired. Haskell testified that Kaman gave no substantive reasons for his termination, merely stating that "the company had grown or changed, and that [Kaman] had been able to grow or change with it, and that [Haskell] had not been able to." To Haskell's comment that "employees who reach the age of 55 or 20 years with the company didn't seem to last," Kaman re-

sponded, "that's the way it seems to be." Haskell was 57 years old at the time of his termination.

After Haskell's departure, 53-year old Lucian Baldwin performed the most substantial part of Haskell's tasks—the production of the annual report and the 10–K statement. Baldwin hired an assistant, 29-year-old Mary Jo Keating, who took over the public relations duties formerly carried out by Lowengard & Brotherhood. The extent to which Keating performed some duties formerly carried out by Haskell rather than by the agency is disputed.

At trial there was no direct evidence that the Company terminated Haskell because of his age. Nor did Haskell testify to statements along such lines by Kaman or any of the Company's senior officers. Instead, Haskell relied upon a few comments made by Kaman during the 15-year period from 1960 to 1975, alleged to suggest prejudice against older employees, to which the Company objected. Specifically, Haskell testified that in the early 1960's Kaman had referred to two Company employees as "old ladies with balls"; that in the early 1970's Kaman had mentioned a Reader's Digest article discussing a medical theory that aging involves a series of small strokes; and that Kaman had used the term "young turks" in 1974 or 1975 to refer to some of the younger employees in the Company.

Also over the Company's objection Haskell testified to the emotional difficulties he had experienced since his termination. The following colloquy took place between Haskell and his attorney:

Q. What is it like, Mr. Haskell, to be unemployed for a period of time?

\* \* \* \* \* \*

A. Well, it's very dispiriting emotionally, particularly the early months of adjustment to the situation.

And then you kind of reach a second wind, where you realize where you're at. And then it gets harder as you realize that you're not getting any answers to your job applications; that the friends that you had in business are turning away from you because—I gather in my case because I had filed action against my employer and they considered me unemployable.

And it's very hard to keep your spirits up. It's very hard to keep going. But somehow you tuck your chin down and do the best you can.

At the trial, which took place in the fall of 1982, six former Company officers were allowed to testify over the Company's objection about terminations of themselves and of others by the Company dating back to 1967, which was prior to the enactment of the ADEA. The district court found that the testimony could provide a circumstantial basis for an inference that the Company preferred younger employees and allowed the witnesses to testify, over the Company's objection, to their subjective evaluations of their own and their fellow officers' job performance.

Kaman testified for the Company at trial that Haskell was terminated because of his deteriorating job performance. He stated that as a result of the Lowengard & Brotherhood incident he "didn't have any confidence left in [Haskell] and [felt that] we might as well terminate him." The next ranking Company officer, Stewart Bliss, also testified that the taping incident was "a severe breach of the integrity of the corporation" and that he felt that Haskell should be terminated.

The district court instructed the jury as to the elements of age discrimination in violation of the ADEA but denied the Company's request to instruct the jury that it must find that Haskell was replaced by a younger employee. The court did instruct the jury that it should find the Company liable for liquidated damages if it found that it had acted "willfully" in terminating Haskell and defined willful to mean acting with intent to disobey the law or with reckless disregard of the law.

On October 15, 1982, the jury returned a verdict in favor of Haskell for $283,000 compensatory damages and $40,000 special damages. The jury determined in response

to a special interrogatory that the Company had not acted willfully and that therefore Haskell was not entitled to liquidated damages. On October 21, 1982, Haskell moved for a new trial on the issue of liquidated damages, arguing that the jury's verdict that the Company violated the ADEA in terminating Haskell was inconsistent with its finding that the Company had not acted willfully. The district court denied that motion on the ground that the jury could have found that the Company had discharged Haskell because of his age but had not done so with knowledge of the illegality of its action. On March 16, 1983, the district court entered judgment for Haskell, awarding him $283,000 compensatory damages, $40,000 special damages, interest on that sum from October 15, 1982, until the date of the judgment, and attorney's fees and costs in the amount of $87,-566. Six days later the district court denied Kaman's motions for a judgment notwithstanding the verdict, a new trial and a remittitur. The Company filed a timely notice of appeal from the judgment and Haskell cross-appealed.

## DISCUSSION

Before considering the parties' contentions a few general principles governing ADEA claims should be stated. The ADEA bars an employer from discharging an employee because of age, 29 U.S.C. § 623(a) (1976), but does not prohibit an employer from discharging an employee based on non-discriminatory factors, however subjective and unsound. *Stanojev v.*

*Ebasco Services, Inc.,* 643 F.2d 914, 919, 921–22 (2d Cir.1981). The defendant is not obligated to show justifiable cause for the discharge. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978) (per curiam). The plaintiff in an ADEA case has the burden of showing that he was discharged because of age. *Stanojev, supra,* 643 F.2d at 921.

A plaintiff may sustain his burden through introduction of direct evidence, such as statements by the employer that age was the reason for the discharge, or through proof of circumstances from which an inference of age discrimination may be drawn, such as those described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), which are applicable to ADEA cases, *Stanojev, supra,* 643 F.2d at 919–920.[1] As in race discrimination cases, a plaintiff may through statistical evidence establish a pattern or practice of discharging or failing to promote older employees, from which an inference of age discrimination may be drawn. *Stanojev, supra,* 643 F.2d at 921. However, "[c]onsiderations such as small sample size may, of course, detract from the value of such evidence, *see, e.g., Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 and evidence showing that the figures for the general population might not accurately reflect the pool of qualified applicants would also be relevant." *International Brotherhood of Teamsters v. United States,* 431

---

**1.** Under the *McDonnell Douglas* formula as applied in ADEA cases a plaintiff may make out a prima facie case of age discrimination by showing that he belongs to the protected group (40 to 70 years of age), that he was sufficiently qualified to continue holding his position, that he was discharged, and that his position thereafter was filled by someone younger than himself or held open for such a person. This evidence creates a presumption that the employer acted for an impermissible age-related reason. The burden of production then shifts to the defendant and may be satisfied by adducing some legitimate non-age-discriminatory reason for the discharge. The burden thereupon returns to the plaintiff to produce evidence that the non-dis-

criminatory reason advanced by the employer was a pretext.

The ultimate burden of persuading the jury by a preponderance of the evidence that he was discharged for age discriminatory reasons rests at all times on the plaintiff. *Stanojev v. Ebasco Services, Inc., supra,* 643 F.2d at 919–920; *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1011 (1st Cir. 1979). Since the defendant in the present case adduced evidence to the effect that it acted for the reason that it no longer viewed Haskell as qualified to hold his position, he was left with the traditional burden of proving that his age was a determining factor or a factor that made a difference in the Company's decision to discharge him.

**120**

U.S. 324, 327, 340 n. 20, 97 S.Ct. 1843, 1850, 1857 n. 20, 52 L.Ed.2d 396 (1977).

*Judgment Notwithstanding the Verdict*

██ A district court may enter a judgment notwithstanding the verdict when, viewing the evidence in the light most favorable to the non-moving party, "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980).

The evidence in support of Haskell's claim of age discrimination in the present case consisted of (1) a few statements by Kaman and others over a period of 15 years, offered to show that his discharge was age-related, (2) replacement of Haskell, 57 years of age, by Baldwin, a person four years younger, and in part by Mary Jo Keating, 29 years of age, (3) dismissals of several other officers, over a period of many years, offered to show a pattern and practice of age discrimination, and (4) testimony by Haskell, offered to rebut the Company's evidence of a history of deteriorating performance on his part.

For reasons stated below we hold that the district court erred in admitting some of the statements attributed to Kaman and in receiving what was claimed to be "pattern and practice" evidence. Assuming that the jury found Haskell's testimony credible and rejected the Company's conflicting evidence of his poor performance, his claim of age discrimination rests heavily on his having been replaced in part by a substantially younger employee and on the remaining Kaman statements found to be admissible. Even these latter statements, which were either adopted or made by Kaman at the time of Haskell's dismissal, i.e. that "employees who reached the age of 55, or 20 years with the company, didn't seem to last" and that Haskell had not

adjusted to the Company's growth and diversification, are ambiguous in the context of the indisputable background of a complete change in the nature of the Company's business, accompanied by extensive growth and diversification into new lines that had occurred over the period involved. Nevertheless, although the admissible evidence suggesting age discrimination was thin, the jury's verdict cannot clearly be characterized as resting on "sheer surmise and conjecture." Accordingly, the district court's decision that the evidence was not so insubstantial as to warrant setting aside the verdict is affirmed.

*Evidentiary Rulings*

██ The Company argues that the district court erred in admitting testimony concerning three statements allegedly made by Kaman during the course of Haskell's employment with the Company: (1) his reference in the early 1960s to two Kaman employees as "old ladies with balls"; (2) his concurrence in the early 1970s with a Reader's Digest article to the effect that there is a relationship between aging and tiny strokes; and (3) his reference in 1974 or 1975 to some younger employees in the company as "young turks." The same contention is made with respect to testimony that Andrien, a Company officer, stated, after Haskell was discharged, that Kaman "doesn't need to do things like this". None of these statements are relevant to the question of whether Haskell was terminated on account of his age. Moreover, there is a substantial likelihood that they prejudiced the jury against the Company in Haskell's favor. Accordingly, we agree that it was error to have admitted them. Kaman next argues that the district court erred in allowing Haskell, over the Company's objection, to testify concerning the emotional difficulties and dispiriting effects he experienced following his termination. We agree. This court recently joined nine other circuits that have considered the question in holding that plaintiffs are not entitled to recovery for emotional distress in ADEA actions. *Johnson v. Al Tech Specialities Steel Corp.*, 731 F.2d 143, 147

(2d Cir.1984)[2]. Haskell's testimony describing the emotional effects of his termination were irrelevant and could only serve to prejudice the jury in his favor. Although Haskell argues that the testimony was relevant to the issue of liquidated damages, his emotional distress on account of his termination is wholly unrelated to the issue of whether his termination by Kaman was willful. The district court erred in admitting this testimony.

■■■■ We also conclude that the district court erred in allowing six former Company officers to testify concerning the circumstances of their own terminations as well as the terminations of a few former Company officers over a period of 11 years. The district court, in admitting the testimony, relied on our decision in *Stanojev, supra*. For such statistical evidence to be probative, however, the sample must be large enough to permit an inference that age was a determinative factor in the employer's decision.

The sample in the present case of ten terminations over an 11-year period is not statistically significant, particularly against a background indicating that most of the Company's many officers had been employed by it for 10 or more years and were more likely than not in the protected age bracket (40 to 70 years). Indeed, the average age of the Company's officers rose during the period from 1969 and 1978 and Haskell irrationally excluded some older persons from the base "class" used by him for comparison. The courts have consistently rejected similar statistical samples as too small to be meaningful. *See, e.g., Mayor of Philadelphia v. Educational Equality League, supra*, 415 U.S. at 621, 94 S.Ct. at 1333 (sample of thirteen too small to be probative); *Pace v. Southern Railway System*, 701 F.2d 1383, 1389 (11th Cir.1983) (twelve employment decisions over twelve years too few to be meaningful); *Coble v. Hot Springs School District No. 6*, 682 F.2d 721 (8th Cir.1982) (sample of fifteen employment decisions over a course of eight years "too small to support any inference of a discriminatory pattern or practice"); *Turner v. Texas Instruments Inc.*, 555 F.2d 1251, 1257 (5th Cir.1977) (eight employment decisions over a two-year period too few to be meaningful).[3]

■■■■ The officers' "pattern and practice" testimony was also inadmissible on other grounds. Some witnesses were improperly permitted to give subjective evaluations of their own and of their fellow officers' performance without furnishing the bases for their evaluations. *See Sweeney v. Research Foundation*, 711 F.2d 1179, 1185 (2d Cir.1983); *Moorhouse v. Boeing Co.*, 501 F.Supp. 390, 393 (E.D.Pa.), *aff'd*, 639 F.2d 774 (3d Cir.1980). Two of the 10 discharged officers were never replaced. Five were replaced by *older* persons and one by a person only eight months the discharged officer's junior. Under these circumstances their testimony, aside from presenting unnecessary collateral issues, provided "no basis for an inference of discrimination." *Pace v. Southern Railway System, supra*, 701 F.2d at 1392 n. 8.

**2.** The following circuits have held that a plaintiff suing for age discrimination in violation of the ADEA, 29 U.S.C. § 623(a), may not recover such compensatory damages. *Vazquez v. Eastern Air Lines, Inc.*, 579 F.2d 107 (1st Cir.1978); *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834 (3d Cir.1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978); *Slatin v. Stanford Research Institute*, 590 F.2d 1292 (4th Cir.1979); *Dean v. American Security Insurance Co.*, 559 F.2d 1036 (5th Cir.1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); *Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir.1983); *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684 (7th Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 453, 74 L.Ed.2d 606 (1982); *Fiedler v. Indianhead Truck Line*, 670 F.2d 806 (8th Cir. 1982); *Naton v. Bank of California*, 649 F.2d 691 (9th Cir.1981); *Perrell v. Finance America Corp.*, 726 F.2d 654 (10th Cir.1984).

**3.** In any event, the testimony of Odlum should have been excluded on the grounds that he was discharged prior to the passage of the ADEA. Any termination prior to the passage of the Act was presumptively lawful and therefore testimony with respect to such termination is not relevant to the question of a pattern or practice of discrimination. *See Ste. Marie v. Eastern Railroad Association*, 650 F.2d 395, 402 (2d Cir. 1981).

Since the testimony of the six former Company officers as to the circumstances of their terminations and those of other Company officers was insufficient to show a pattern and practice of discrimination, it was not relevant to the question of whether Haskell was terminated for age-related reasons. Moreover, the probative value of the testimony was so "substantially outweighed by the danger of unfair prejudice" that it definitely should have been excluded by the district court in accord with Fed.R. Evid. 403. As the court noted in *Moorhouse v. Boeing Co., supra,* 501 F.Supp. at 393 n. 4, with respect to similar testimony of former employees concerning the reasons for their terminations, "even the strongest jury instructions could not have dulled the impact of a parade of witnesses, each recounting his contention that defendant had laid him off because of his age." Thus the error can hardly be characterized as harmless.

The cumulative effect of the district court's erroneous evidentiary rulings requires reversal and remand for a new trial.

*Jury Charge*

█ The Company next argues that the district court erred in failing to charge the jury that it must find that Haskell was replaced by a younger person. Because of our decision on the evidentiary rulings, it is not necessary to determine whether or not the court committed reversible error in charging the jury on the elements of an ADEA action and whether Kaman timely objected to that charge. However, we do note that this court has observed that one of the elements of a prima facie case based on circumstantial evidence is the replacement of the plaintiff "by a younger employee or keeping the post open to receive one." *Stanojev, supra,* at 924 n. 7. Although proof of replacement by a person less than 40 years of age is not essential, the successor should ordinarily be substantially younger than the discharged officer he replaces to warrant an inference of age discrimination from the circumstance of

age difference. The replacement of a discharged employee by someone a year or two younger hardly indicates that the discharge was motivated in whole or part by the former's age. As the court noted in *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 n. 9 (1st Cir.1979):

In an age case, the probative value of evidence as to the age of complainant's replacement obviously will depend on complainant's own age and the age difference. Replacement of a 60 year old by a 35 year old or even a 45 year old within the protected class would be more suggestive of discrimination than replacement of a 45 year old by a 42 year old within the protected class or by a 39 year old outside it. Replacement by someone older would suggest no age discrimination but would not disprove it conclusively.

On a retrial the court should instruct the jury accordingly.

*Liquidated Damages*

█ In support of his cross-appeals, Haskell argues that the jury's verdict on the question of willfulness was inconsistent because the jury could not have found that Kaman discharged Haskell on account of his age without finding that it did so willfully. We disagree. It is true, as we noted in *Air Line Pilots Ass'n v. Trans World Airlines,* 713 F.2d 940, 956 (2d Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 1706, 80 L.Ed.2d 179 (1984), that "Congress has provided no statutory definition of 'willfulness,' ... and the legislative history of the ADEA is silent on this point. *Wehr v. Burroughs Corp.,* 619 F.2d 276, 282 (3d Cir.1980)." However, we also there concluded that a plaintiff "need not prove a specific intent to violate the ADEA; it is sufficient to establish that the employer either knew or showed a reckless disregard for the matter of whether its conduct was prohibited by the ADEA.," *Id.* 956. Thus, although there is a split of authority on the extent of knowledge on the part of the employer required to establish willfulness,[4]

---

4. As we stated in *Hagelthorn v. Kennecott Corp.,*

710 F.2d 76, 84 (2d Cir.1983):

[redacted] 

we believe that a plaintiff must at least show that the employer was aware that its conduct was governed by the ADEA; the failure of such an employer to investigate the matter further would amount to reckless disregard for whether its conduct violated the Act.

[redacted] In the present case, Judge Cabranes instructed the jury that "a violation of the law is wilful if it is done with intent to disobey the law or with reckless disregard as to whether or not one has a right to act in that particular way." Although this instruction, if objected to, might have been amplified to incorporate the foregoing, Haskell did not object to this portion of the charge or seek amplification. He therefore waived any right to do so by cross-appeal. Rule 51, F.R.Civ.P.; *Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 (2d Cir.1981).

Moreover, Haskell waived his right to object to the resulting verdict by failing to do so before the jury was discharged. F.R. Civ.P. 49(b) provides that if the jury's answers are inconsistent with each other the court shall return the jury for further consideration of its answers or shall order a new trial. An objecting party, however, is not entitled to a new trial unless it objects before the jury is discharged. As the First Circuit noted in *Skillin v. Kimball*, 643 F.2d 19, 19–20 (1st Cir.1981):

> the only efficient time to cure these possible problems of inconsistency would be after the jury announced the results of its deliberations and before it was excused.... To allow a new trial after the objecting party failed to seek a proper remedy at the only possible time would undermine the incentives for efficient trial procedure and would allow the possible misuse of Rule 49 procedures—no evidence of which do we detect in this case—by parties anxious to implant a ground for appeal should the jury's opinion prove distasteful to them.

*See also Ludwig v. Marion Laboratories, Inc.*, 465 F.2d 114, 118 (8th Cir.1972); *Tennessee Consolidated Coal Co. v. United Mine Workers of America*, 416 F.2d 1192, 1200 (6th Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970).

We reverse the judgment of the district court for the plaintiff and remand for a new trial the question of whether the Company discharged Haskell in violation of the ADEA. We affirm the judgment of the district court denying liquidated damages for failure to prove that the Company's actions were willful.

[redacted]

This issue has split the court of appeals. The Fourth and Fifth Circuits have held that a violation of the act is willful if the defendant "knows or has reason to know that his conduct is governed by [the Act]". *Crosland v. Charlotte*, 686 F.2d 208, 217 (4th Cir.1982); *Hedrick v. Hercules*, 658 F.2d 1088, 1096 (5th Cir.1981). The Seventh Circuit has adopted a more stringent willfulness standard, requiring that the employer know or have reason to know that its conduct violates the act. *Syvock v. Milwaukee Boiler Manufacturing Co.*, 665 F.2d 149, 156 (7th Cir.1981).