Martin GRAY, Plaintiff,

v.

**THE ROBERT PLAN CORPORATION, Defendant.**

**No. CV96–4880 (DRH).**

United States District Court,
E.D. New York.

Jan. 9, 1998.

---

**17.** At the August 12, 1997 hearing, counsel for King indicated that King joins in this motion.

Martin Gray, Long Beach, NY, pro se.

Lowenstein, Sandler, Kohl, Fisher & Boylan, P.C., Roseland, NJ by David W. Field, Lisa G. Drillich, Uniondale, NY, for Defendant.

### MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before the Court in this employment discrimination action is Defendant The Robert Plan Corporation's ("RPC's") motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted.

## BACKGROUND

Plaintiff Martin Gray was hired by RPC as an insurance underwriter on March 1, 1993. (Compl. ¶ 8.) Plaintiff was sixty-three years of age at the time of his hiring, and sixty-six years of age at the time of his termination on June 27, 1996. (*Id.* ¶ 7; Finnegan Certification ("Certif.") Ex. D.)

Upon commencing employment at RPC, Plaintiff, as an underwriting trainee, was rotated through various sections of the Underwriting Department. (RPC's Rule 3(g) Statement ¶ 4; Finnegan Cert. ¶ 3.) Other than being warned about his personal hygiene on three separate occasions during the first three months of his employment, (*see* Horowitz Certif. Exs. D–F), Plaintiff received positive evaluations from his supervisors over the next couple of years with respect to his job performance. (Pl.'s Answer to Def.'s Mot. for Summ. J. ("Pl.'s Answer") Exs. A–D.).

In February 1996, after spending time in both the Customer Service and Telephone Interview Sections of the Underwriting Department, Plaintiff was assigned by Dawn Palumbo, the Manager of the Underwriting Department, to work in the Premium Review Section. (Pl.'s Statement at 1; Finnegan Certif. ¶ 5.) The Premium Review Section reviews telephone interviews conducted with potential automobile insureds to ensure that an appropriate premium is being charged; additionally, the Section investigates insurance applications to "make sure [they] accurately reflect[] the facts surrounding each applicant." (Finnegan Certif. ¶ 4.)

On May 14, 1996, Plaintiff received a verbal[1] warning for unsatisfactory job performance. (Finnegan Certif. Ex. A.) The written record of the warning, which was processed and signed by Patricia Finnegan, Supervisor of the Premium Review Section, stated that Finnegan had "sat with [Plaintiff]

and reviewed his errors with him." (*Id.*) Finnegan further recorded that Plaintiff's "quota was far below the department standards[2] and [contained] a substantial amount of errors," and that she would "continue checking all of [Plaintiff's] work." (*Id.*) On May 30, 1996, Plaintiff was issued a written warning for unsatisfactory job performance, again processed and signed by Finnegan. (Finnegan Certif. Ex. B.) In the written warning, Finnegan stated that since the verbal warning issued to Plaintiff on May 14, 1996, she had been checking all of Plaintiff's work, and that either herself or another underwriter had been meeting with Plaintiff to review his errors. (*Id.*) In conjunction therewith, Finnegan made the following observations:

To this date, [Plaintiff's] errors have not improved.[3] There are certain guidelines that [RPC] must follow that [Plaintiff] is not following. (see attached for examples)[.] After almost four months, [Plaintiff] has not yet grasped all the concepts, regulations, and requirements of Phase 1 training (on average, these tasks are learned in a two[-]month period and [the trainee] move[s] on to Phase 2 training).

(*Id.*) The written warning concluded as follows:

Someone will be designated to sit with [Plaintiff] on a frequent basis to train and observe his work production. If [Plaintiff's] errors do not improve by June 27, [1996] (4 weeks), further disciplinary action will be taken up to and including termination.

(*Id.*)

According to Finnegan, when Plaintiff's work did not improve by June 27, 1996, she recommended that he be terminated. (Finnegan Certif. ¶ 9.) Palumbo, who avers that she had reviewed Plaintiff's disciplinary warnings and was further kept apprised of Finnegan's efforts to train Plaintiff, accepted

---

1. While "verbal" could connote either an oral or written warning, RPC uses the term "verbal" in its personnel manual. (*See* Finnegan Certif. Ex. E.)

2. In her Certification, Finnegan elaborates that while employees in the Premium Review Section generally process fifty to sixty telephone inter-

views per day, Plaintiff was handling approximately thirty to forty. (Finnegan Certif. ¶ 6.)

3. Specific errors allegedly committed by Plaintiff are enumerated by Finnegan in personal notes she took in connection with her review of Plaintiff's work. (*See* Finnegan Certif. Ex. C; *see also* Finnegan Certif. ¶ 6.)

Finnegan's recommendation to terminate Plaintiff. (Palumbo Certif. ¶¶ 3–4.) At a meeting on June 27, 1996, attended by Plaintiff, Palumbo and Finnegan, Plaintiff was advised that he was being terminated for poor work performance. (Palumbo Certif. ¶ 5; Finnegan Reply Certif. ¶ 5; Horowitz Certif. Ex. G.) According to Finnegan, at the time of Plaintiff's termination, he admitted "that there was simply too much information for him to absorb and understand." (Finnegan Certif. ¶ 13.)

Plaintiff commenced the instant action on October 4, 1996 pursuant to the Age Discrimination in Employment Act of 1967, (the "ADEA"), 29 U.S.C. § 621 et seq., alleging that he was discharged from his employment on account of his age.

## DISCUSSION

### I. Summary Judgment Standards

The legal principles employed by the Court when ruling upon a motion for summary judgment are well-established. Summary judgment may be granted only when it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). The moving party bears the initial burden "of showing the absence of a genuine issue as to any material fact." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The substantive law governing the case will determine those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has come forward with support demonstrating that no genuine issue of material fact remains to be tried, the non-moving party "must come forward with affidavits, depositions, or other sworn evidence as permitted by Fed.R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996). In reviewing these materials, the Court "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." Id.

Nevertheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48 (emphases omitted). Moreover, "[c]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,'" Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir.1990)(quoting Anderson, 477 U.S. at 252), and "more than 'some metaphysical doubt as to the material facts.'" Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Put another way, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, ... or defeat the motion through mere speculation or conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (citations and internal quotations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).

### II. ADEA Standards

The ADEA makes it "unlawful for an employer ... to discharge an individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA protects only those employees who, like Plaintiff, are older than forty but less than seventy years of age. See 29 U.S.C. § 623(a)(1); Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir.1994). ADEA claims are scrutinized under the burden-

shifting analysis for Title VII claims articulated by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See, e.g., Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997); *Woroski*, 31 F.3d at 108.

In order to establish a prima facie case of age discrimination, Plaintiff must show "1) that he was within the protected age group, 2) that he was qualified for the position at issue, 3) that he suffered an adverse employment decision, and 4) that the position was ultimately filled by a person not of the protected class." *Raskin*, 125 F.3d at 63–64; *see Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir.1991). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir.1997)(per curiam); *see Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir.1995)(characterizing plaintiff's initial burden as *"de minimis"*). Establishment of the prima facie case creates a presumption that the employer's adverse employment decision constituted unlawful discrimination against the employee. *See Burdine*, 450 U.S. at 254.

After a plaintiff makes out a prima facie case of age discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment decision. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "Any legitimate non-discriminatory reason will rebut the presumption [of discrimination] triggered by the prima facie case." *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir.1997)(en banc), *petition for cert. filed*, 66 U.S.L.W. 3178 (U.S. Sept. 2, 1997)(No. 97–404). The employer need not conclusively establish the validity of its proffered reason, rather, it merely must show that such reason, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the [adverse] employment action." *St. Mary's Honor Ctr.*, 509 U.S. at 507.

Once the employer has articulated a legitimate non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to put forth "adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [age] was the reason for the [adverse decision]." *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *see also Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir.1997)("The ultimate issue ... is whether the plaintiff has sustained its burden of proving that the adverse action was motivated by an impermissible reason."). In this regard, however, "a finding of pretext, together with the evidence comprising a prima facie case, is not always sufficient to sustain an ultimate finding of intentional discrimination." *Fisher*, 114 F.3d at 1338. Instead,

a Title VII plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext *for discrimination*, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both. And the Supreme Court tells us that "a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." We have recognized again and again that a plaintiff does not necessarily satisfy the ultimate burden of showing intentional discrimination by showing pretext alone. A finding of pretext may advance the plaintiff's case, but a plaintiff cannot prevail without establishing intentional discrimination by a preponderance of the evidence.

*Fisher*, 114 F.3d at 1339 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

A plaintiff may discharge his burden of showing that the reason for the adverse employment action was illegal discrimination by relying on "the evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or

erroneous character of the employer's proffered reason for the adverse action." *Fisher,* 114 F.3d at 1333. Accordingly, in some situations, a jury's disbelief of an employer's proffered non-discriminatory reason, along with a plaintiff's prima facie case, *could* permit a finder of fact to find unlawful discrimination. *See id.*

 In evaluating an employer's actions in the context of a discrimination claim, the Court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)(cited in *Scaria,* 117 F.3d at 655). An employer is "not obligated to show justifiable cause for the discharge." *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984). Instead, "[t]he plaintiff in an ADEA case has the burden of showing that he was discharged because of age." *Id.* "A business decision need not be good or even wise. It simply has to be nondiscriminatory ...." *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 20 (7th Cir.1987)(cited in *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988)). "Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons." *Dister,* 859 F.2d at 1116; *see Visco v. Community Health Plan,* 957 F.Supp. 381, 388 (N.D.N.Y.1997)("[A]n employer may exercise business judgment in making personnel decisions as long as they are not discriminatory ."); *Orisek v. American Inst. of Aeronautics and Astronautics,* 938 F.Supp. 185, 190 (S.D.N.Y.1996)("Title VII and the ADEA forbid disparate treatment on the basis of age, gender and national origin, but they may not be invoked merely to challenge the wisdom of any employer's decision.")

With the foregoing principles in mind, the Court proceeds to address the merits of RPC's motion.

### III. *McDonnell Douglas/Burdine* Burden–Shifting Test

#### A. *Plaintiff's Prima Facie Case*

For purposes of the instant motion, RPC stipulates that Plaintiff has established a prima facie case of age discrimination. Accordingly, a presumption arises that Plaintiff's termination constituted unlawful discrimination on account of his age.

#### B. *RPC's Proffered Non–Discriminatory Reason for Plaintiff's Discharge*

 RPC contends that Plaintiff was discharged on account of his poor work performance in the Premium Review Section. In support thereof, RPC has produced a certification from Finnegan detailing Plaintiff's unsatisfactory performance in that Section. As a result of Plaintiff's numerous "qualitative and quantitative shortcomings," RPC maintains, he was given a verbal warning on May 14, 1996, some three-and one-half months after entering the Premium Review Section for training. (Finnegan Certif. ¶ 7 & Ex. A.) The verbal warning was issued in accordance with RPC's Policy Manual, which Plaintiff received upon commencing employment at RPC.[4] (Finnegan Certif. Ex. F.) When Plaintiff's work allegedly did not improve over the next two weeks, Finnegan placed Plaintiff on written warning, again in accordance with RPC's Policy Manual.[5] (Finnegan Certif. ¶ 8 & Ex. B.) This time,

---

4. The Policy Manual contains a section entitled "Disciplinary Procedures." The "Verbal Warning" portion reads as follows:

 The Manager will (a) discuss the problem with the employee[,] (b) suggest ways to correct the problem[,] (c) establish a reasonable time frame within which the employee must show improvement, and (d) tell the employee that they will be subject to further discipline and/or discharge if they do not improve within the designated period.
 (Finnegan Certif. Ex. E.)

5. The "Written Warning" portion of the "Disciplinary Procedures" section reads as follows:

 The Manager will give the employee a written warning (a) outlining the deficiencies and specific steps for improvement, (b) establishing a reasonable time frame within which the employee must improve, and (c) advising the employee that if they do not improve within the designated period, they will be subject to further discipline up to and including discharge. The employee will be given an opportunity to discuss the written warning and comment about it in writing.
 (Finnegan Certif. Ex. E.)

the written warning explicitly stated that if Plaintiff's performance did not improve over the following month, "further disciplinary action will be taken up to and including termination." (Finnegan Certif. Ex. B.) According to Finnegan, Plaintiff's errors were "[n]ot only ... potentially prevent[ing] RPC from charging the correct premium[s], [but] they also could have caused RPC to violate certain New York State [insurance] Regulations." [6] (Finnegan Certif. ¶ 6.)

When Plaintiff allegedly showed no improvement over the following month, Finnegan recommended to Palumbo that Plaintiff be terminated. Palumbo, who claims she had been kept apprised of Plaintiff's problems and had reviewed his work, agreed with and accepted Finnegan's recommendation. (Finnegan Certif. ¶ 9; Palumbo Certif. ¶ 4.)

Based upon the foregoing, the Court finds that RPC has established a legitimate reason for Plaintiff's termination which, if credited by the trier of fact, would support a finding that such termination was not the product of unlawful discrimination.

### C. *Pretext*

The Court having concluded that RPC satisfied its burden of production, "the presumption of discrimination that was raised upon a showing of the prima facie case no longer operates," *Fisher*, 114 F.3d at 1336, and the Court turns to the third prong of the *McDonnell Douglas/Burdine* test, namely, whether RPC's proffered reason for Plaintiff's termination is pretextual, and whether in fact the real reason for Plaintiff's discharge was discrimination based on Plaintiff's age. "To sustain the burden of putting forth a case that can support a verdict in his favor, [P]laintiff must ... point to sufficient evidence to reasonably support a finding that he was harmed by the employer's illegal discrimination." *Fisher*, 114 F.3d at 1337.

In support of his claim that RPC's proffered reason for his termination is pretextual, Plaintiff raises a number of issues. First, he cites to his work history, noting that (a) no disciplinary action was taken against him

after May 20, 1993 until the May 14, 1996 verbal warning which ultimately led to his termination; (b) he had an excellent attendance record at RPC; and (c) he received good evaluations from RPC during his first two years at the company. Second, he questions RPC's "heavy" reliance on Finnegan's Certification, pointing out that it was Palumbo who had authority for rotating him through various sections of the Underwriting Department and who had knowledge of his work performance throughout his tenure at RPC. Third, Plaintiff alludes to favorable comments made to him by supervisors of the Interview and Customer Service Sections of the Underwriting Department. Fourth, Plaintiff maintains that RPC purposely trained him inadequately in order to obtain a legitimate reason to terminate him. Finally, Plaintiff asserts that of the "approximately 13" underwriters in the Premium Review Section, he was the only underwriter over forty years of age. Each of these issues will be addressed in turn.

#### 1. *Plaintiff's Prior Work History*

As support for his claim that RPC "orchestrated" his termination, Plaintiff relies upon the four positive job evaluations he received on August 19 and November 19, 1993, February 28, 1994 and February 13, 1995, as well as his excellent attendance record. RPC stipulates that Plaintiff had an excellent attendance record during his tenure at RPC, and further concedes that his job evaluations prior to joining the Premium Review Section were "not that bad." (Def.'s Reply Br. at 3.) RPC maintains, however, that Plaintiff's discharge was predicated solely upon his poor job performance in the Premium Review Section.

The Court concludes that Plaintiff's reference to his prior work history fails to raise a genuine issue of material fact on the issue of pretext. Initially, the Court notes that all of the positive job evaluations to which Plaintiff points were issued prior to his transfer to the Premium Review Section. Plaintiff's satisfactory performance in other sections of the Underwriting Department has little or no

---

**6.** As referenced previously, in both her Certification and in her handwritten notes of Plaintiff's performance through May 30, 1996, Finnegan sets forth specific errors committed by Plaintiff during his training in the Premium Review Section. (*See* Finnegan Certif. ¶ 6 & Ex. C.)

probative value on the issue of his performance in the Premium Review Section, given the different duties required of employees in that Section. In point of fact, Plaintiff presents no evidence that work performed in the Premium Review Section is the same, or even similar, to that performed in the various other sections of the Underwriting Department.

█ In any event, the fact that Plaintiff's warnings followed previous positive job evaluations is not, standing alone, evidence of discrimination. *See Moorer v. Grumman Aerospace Corp.*, 964 F.Supp. 665, 674 (E.D.N.Y.1997)("[P]rior good evaluations of the plaintiff's work performance [cannot] alone establish that later unsatisfactory evaluations are pretext for unlawful discrimination.").

### 2. *RPC's Reliance on the Finnegan Certification*

█ In his opposition papers, Plaintiff questions RPC's "heavy" reliance on Finnegan's Certification. More particularly, Plaintiff notes that RPC submitted no affidavits from either Palumbo or other supervisors for whom he worked in the Underwriting Department. This argument also fails to raise a genuine issue of material fact on the issue of discrimination.

In its reply papers, RPC submitted a Certification from Palumbo. In her Certification, Palumbo states that although she was the Manager of the Underwriting Department, Plaintiff did not report directly to her, nor did she have much firsthand knowledge of his work product. (Palumbo Certif. ¶ 2.) Instead, the poor work performance upon which RPC relied in terminating Plaintiff occurred during his time spent in the Premium Review Section, where he worked directly under Finnegan, who personally reviewed Plaintiff's work and discussed his errors with him. (Finnegan Certif. ¶ 5 & Exs. A–B.) After reviewing Plaintiff's disciplinary warnings and speaking with Finnegan, Palumbo

accepted Finnegan's recommendation to terminate Plaintiff. (Palumbo Certif. ¶¶ 3–4.)

As regards RPC's failure to submit affidavits from Plaintiff's other supervisors in the Underwriting Department, the Court again emphasizes that the evidence submitted indicates that RPC's discharge of Plaintiff was based solely upon his performance in the Premium Review Section. Accordingly, any other supervisor's opinion of Plaintiff's abilities, in the absence of any evidence that the work performed in the various sections of the Underwriting Department was the same or similar, is irrelevant.

### 3. *Favorable Comments By Plaintiff's Previous Supervisors*

█ Plaintiff next references certain statements made to him by Eleanor Bott, the Supervisor of the Customer Service Section, and Jackie Orso, the Supervisor of the Interview Section. Plaintiff claims that he was placed into the Customer Service Section "at the insistance [sic] of... Eleanor Bott, who wondered why [he] was being pushed around." (Pl.'s Statement at 1.) He further claims that soon after entering the Interview Section, Orso told him "she liked what she heard after she had monitored [him], and that [he] was good." (*Id.* at 2.)

Notwithstanding the fact that these statements are hearsay, they nevertheless fail to raise a genuine issue of material fact. Without belaboring the point, the Court concludes that Orso's alleged positive comments of Plaintiff's work in the Interview Section are irrelevant to his performance in the Premium Review Section. As to Bott's alleged statements to Plaintiff, they are offered in the context of Plaintiff's contention that beginning approximately one year prior to his termination, he was actually "relieved of [his] duties as an underwriter" by Palumbo and "given menial tasks to do" such as simple computer work or affixing labels to insurance policies. (*Id.* at 1.) Plaintiff himself concedes, however, that he spent the last six months of his employment in both the Interview and Premium Review Sections performing "normal" work .[7] To the extent that

---

7. Plaintiff complains about being transferred out of the Customer Service Section after "just one day" and out of the Interview Section after "a

few weeks." As referenced previously, however, the Court's task in an employment discrimination case is not to sit in judgment on a corpora-

Plaintiff performed "menial tasks" prior to that time, Palumbo avers that "many, if not all, of the other employees in the other Sections of the Underwriting Department" were required to "do computer work and put labels on insurance policies." (Palumbo Certif. ¶ 6.)

In any event, Bott's alleged statement that Plaintiff was being "pushed around," without more, fails to provide any evidence of age discrimination. *See also Grumman*, 964 F.Supp. at 675 (finding plaintiff's former supervisors' alleged statements to plaintiff to the effect that company was trying to "screw" him, standing alone, did not constitute evidence of discrimination). The Court notes in this regard that, even assuming such a statement was admissible, Plaintiff failed to produce any evidentiary material whatsoever, such as non-party affidavits or deposition testimony, validating his assertion that the company was "out to get him" and/or further linking the company's alleged behavior to age discrimination.

### 4. *Plaintiff's Claim of Improper Training*

Plaintiff claims that RPC purposely trained him inadequately in order to obtain a legitimate reason to terminate him. In support of his theory, Plaintiff maintains that Supervisor Finnegan assigned Joseph Romano, another RPC underwriter, to train him exclusively for the first three months in which he worked in the Premium Review Section. As Finnegan had disciplined Romano in 1995 for "the same qualitative and quantitative problems as [Plaintiff]," (Finnegan Certif. ¶ 12), the argument goes, it follows that RPC never intended to train Plaintiff properly for the job.

Other than his own interpretation of the significance of the trainer/trainee relationship between himself and Romano, however, Plaintiff presents absolutely no evidence, be it anecdotal or otherwise, suggesting that RPC deliberately designated Romano to train Plaintiff because Romano was a sub-par employee. While RPC concedes that Romano had been disciplined for poor performance prior to Plaintiff's commencement of work in the Premium Review Section, it maintains that Romano "responded well to that discipline and was functioning as a competent employee" when he was asked to train Plaintiff. (Finnegan Reply Certif. ¶ 7.) Moreover, the record reflects that Romano was but one of the RPC employees who trained Plaintiff during his time in the Premium Review Section. Finnegan herself took part in training Plaintiff, as did Sal Orso,[8] whom Plaintiff personally selected after receiving the May 14, 1996 verbal warning. Finally, the Court observes that Plaintiff never complained to Finnegan about the training he received from Romano.

Accordingly, Plaintiff's conclusory allegation of a conspiracy by RPC to terminate him on account of his age, under the guise of poor work performance, does not constitute evidence that RPC discriminated against him.[9] Even assuming, *arguendo*, that RPC's designation of Romano to train Plaintiff constituted some evidence of discriminatory motive, in the Court's view it is too minimal to establish a material issue of fact. *See Woroski*, 31 F.3d at 109–10 (noting that "*some* evidence is not sufficient to withstand a properly supported motion for summary judgment").

tion's business decisions. *See supra* pp. 8–9 (and cases cited therein). Instead, the Court must determine whether a rational jury could find that an employer's actions were discriminatory. Here, Plaintiff offers no evidence suggesting RPC's motive in transferring him out of the Customer Service and Interview Sections was age discrimination.

8. Finnegan describes Orso as one of her "best underwriters" who has "successfully trained many employees." (Finnegan Reply Certif. ¶ 8.)

9. Plaintiff also attempts to rebut RPC's claim that of the eighty-four employees over forty years of age laid off or terminated between April 1, 1993 and June 30, 1996, only one asserted that his termination was age-related. It is Plaintiff's "opinion" that many of these employees were subjected to age discrimination, but that they were deterred from seeking redress because RPC is "known in the insurance industry as being the most investigative insurance firm in America" and that these former employees "know what [RPC's] investigations have done to insureds and their families." (Pl.'s Statement at 3.) Plaintiff's "opinion," however, without a shred of factual support, amounts to nothing more than speculation and surmise.

### 5. *Statistics*

█ Plaintiff's final attempt to defeat summary judgment comes in the form of statistical evidence. Specifically, Plaintiff contends that other than himself, the only other employee of the "approximately 13" in the Premium Review Section over forty years of age, *i.e.*, Patricia Schmidt, is a "part-time" worker. Plaintiff further speculates that "most" of the employees under forty are also under twenty-five years old. RPC rebuts that Schmidt is not a part-time worker, but rather a full-time underwriter. (Finnegan Reply Certif. ¶ 6.)

To be sure,

an individual disparate treatment plaintiff may use statistical evidence regarding an employer's general practices at the pretext stage to help rebut the employer's purported nondiscriminatory explanation. Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive.

*Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir.1990) (citations omitted). Nevertheless, statistical evidence based upon small samples is generally not probative of discrimination, *see Haskell*, 743 F.2d at 120 ("For ... statistical evidence to be probative, ... the sample must be large enough to permit an inference that age was a determinative factor in the employer's decision."), because "statistical significance becomes harder to attain as the sample size shrinks." *Coates v. Johnson & Johnson*, 756 F.2d 524, 541 (7th Cir.1985).

In the instant case, the relevant sample is the "approximately 13" workers in the Premium Review Section, of which one person appears to be over forty years of age. Even accepting Plaintiff's numbers at face value, along with his assertion that the only employee in that Section who is over forty works part-time, the sample size of thirteen employees is too small to create an inference of discrimination. *See Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 39

L.Ed.2d 630 (1974)(holding racial-composition percentage comparisons with respect to thirteen-member panel "were correctly rejected by the District Court as meaningless"); *see also Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 943 (6th Cir.1987)(characterizing sample of seventeen people as "suspect"); *Haskell*, 743 F.2d at 121 (sample of ten terminations over eleven-year period "statistically insignificant" and "too small to be meaningful")(collecting cases where samples ranged from eight to fifteen).

Apart from the small number of employees in the Premium Review Section, the Court also harbors serious doubts that the Premium Review Section, as opposed to the total number of employees in all of the sections of the Underwriting Department, is the proper pool of employees to look to for statistical purposes. It is, after all, undisputed that underwriters at RPC are rotated through the various sections of the Underwriting Department. (Finnegan Certif. ¶ 3; RPC's Rule 3(g) Statement ¶ 4.) Plaintiff, however, failed to supply the Court with relevant figures in this regard.

### 6. *Final Comments*

Although not addressed directly by RPC, the Court observes that Plaintiff was sixty-three years old when he was hired by RPC—well-within the protected class. This cuts against Plaintiff's argument that RPC's real reason for terminating him was his age and, more specifically, that RPC spent a "whole year ... deliberate[ly] maneuvering and manipulat[ing] to finally find a legitimate reason to terminate [Plaintiff]." (Pl.'s Statement at 2); *see Piasecki v. Daughters of Jacob Nursing Home, Inc.*, 808 F.Supp. 1136, 1141 (S.D.N.Y.1992)(fact that employer hired plaintiff at age seventy "suggests a non-discriminatory intent"); *Melnyk v. Adria Lab.*, 799 F.Supp. 301, 319 (W.D.N.Y.1992)("Without additional evidence, it is difficult to justify a conclusion of age discrimination when [the employer] hired [the plaintiff] [at age thirty-nine][,] just one year prior to her entry into the protected class.")

Moreover, glaringly absent from Plaintiff's opposition papers is any refutation of RPC's claims of his poor work performance in the

Premium Review Section. While Plaintiff stresses his good performance in various other sections of the Underwriting Department, he does not deny that the underwriters at RPC are rotated through all of the sections, nor does he argue, for example, that the underwriters needed to perform satisfactorily in only certain sections.

In sum, the Court holds that upon the evidence adduced by Plaintiff, no rational jury could find that RPC's proffered reason for Plaintiff's termination was pretextual and that, more likely than not, the real reason was age discrimination.

## CONCLUSION

For the reasons articulated above, RPC's motion for summary judgment is **GRANTED**, and the Complaint is dismissed. The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**